Robinson did not show a reasonable probability that the purported testimony of the five witnesses trial counsel allegedly failed to call would have caused a different result at the trial. Robinson therefore did not show prejudice from counsel's alleged deficient performance in this postconviction appeal.

We further note that Robinson contends that the cumulative result of the alleged instances of ineffective assistance of counsel resulted in an unfair trial requiring postconviction relief. However, because we conclude that each of Robinson's individual claims was without merit, we further conclude that the cumulative effect of such claims did not result in an unfair trial and does not merit postconviction relief.

CONCLUSION

We determine that, because Robinson failed to take a timely appeal, we lack jurisdiction in this appeal to consider Robinson's assignments of error related to claims which the district court denied without an evidentiary hearing in the order entered March 16, 2009. With regard to Robinson's assignments of error related to claims which the district court denied after an evidentiary hearing in the order entered February 18, 2010, following our independent review, we conclude that the district court did not err when it concluded that such claims were without merit and denied Robinson's motion for postconviction relief.

AFFIRMED.

HEAVICAN, C.J., participating on briefs.

———————

JEREMIAH J., APPELLEE, V.
DAKOTA D., APPELLANT.
___ N.W.2d ___

Filed March 7, 2014.    No. S-13-478.

1. **Appeal and Error.** An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court.
2. **Adoption: Appeal and Error.** Appeals in adoption proceedings are reviewed by an appellate court for error appearing on the record.

3. **Judgments: Appeal and Error.** When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.

4. **Evidence: Appeal and Error.** Where credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give great weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another.

5. **Constitutional Law: Parental Rights.** The interest of parents in the care, custody, and control of their children is perhaps the oldest of the fundamental liberty interests recognized by the U.S. Supreme Court.

6. **Parental Rights: Adoption.** The foundation of Nebraska's adoption statutes is the consent of a biological parent to the termination of his or her parental rights.

7. **Parental Rights: Paternity: Adoption.** In order to terminate a father's rights through an adoption procedure, the consent of the adjudicated father of a child born out of wedlock is required for the adoption to proceed unless the Nebraska court having jurisdiction over the custody of the child determines otherwise, pursuant to Neb. Rev. Stat. § 43-104.22 (Reissue 2008).

8. **Parental Rights: Paternity: Proof.** Because Neb. Rev. Stat. § 43-104.22 (Reissue 2008) can effectively terminate the parental rights of a father, the exceptions under § 43-104.22 must be proved by clear and convincing evidence.

9. **Abandonment: Words and Phrases.** Willful abandonment has been defined as a voluntary and intentional relinquishment of the custody of the child to another, with the intent to never again claim the rights of a parent or perform the duty of a parent; or, second, an intentional withholding from the child, without just cause or excuse, by the parent, of his presence, his care, his love and his protection, maintenance, and the opportunity for the display of filial affection.

10. **Abandonment: Intent.** The question of abandonment is largely one of intent to be determined in each case from all the facts and circumstances.

11. **Abandonment: Intent: Evidence.** Evidence of a parent's conduct is relevant to a determination of whether the purpose and intent of that parent was to abandon the child.

12. **Adoption: Abandonment: Proof.** The issue of abandonment in an adoption proceeding must be established by clear and convincing evidence.

13. **Parental Rights: Words and Phrases.** Parental unfitness in the context of termination of parental rights cases is a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's well-being.

14. **Parental Rights: Proof.** Parental unfitness in the context of termination of parental rights cases must be proved by clear and convincing evidence.

Appeal from the County Court for Hall County: Philip M. Martin, Jr., Judge. Affirmed.

Marvin L. Andersen, of Bradley, Elsbernd, Andersen, Kneale & Mues Jankovitz, P.C., for appellant.

Mark Porto, of Shamberg, Wolf, McDermott & Depue, for appellee.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

McCormack, J.

## NATURE OF CASE

This appeal asks us to determine whether Jeremiah J.'s consent is required before Dakota D. can place their minor child, born out of wedlock, up for adoption. Upon remand from the first appeal presented to this court[1] and after a subsequent bench trial, the county court found that Jeremiah's consent to any proposed adoption of the minor child was required. Dakota now appeals that finding.

## BACKGROUND

Dakota wants to place her child up for adoption. Jeremiah, the unwed biological father, filed an "Amended Petition to Establish Necessity of Father's Consent to Adoption" with the county court in an attempt to prevent the adoption proceedings. The county court granted Dakota's motion for summary judgment, because it determined that Jeremiah did not comply with the statutory requirement under Neb. Rev. Stat. § 43-104.02 (Reissue 2008) that an objection must be filed within 5 business days of the child's birth. Jeremiah appealed.

On appeal, we reversed, and remanded the cause for further proceedings.[2] We found that a material issue of fact existed as to whether Dakota was estopped from relying upon § 43-104.02 for intentionally misleading Jeremiah about the child's date of birth to prevent him from complying with the requirements of § 43-104.02.

### Evidence Presented at Trial

On remand, the county court held a bench trial. An exhibit was admitted into evidence which contained the bill of exceptions from the May 1, 2012, summary judgment hearing.

---

[1] *Jeremiah J. v. Dakota D.*, 285 Neb. 211, 826 N.W.2d 242 (2013).

[2] *Id*.

Additionally, both parties stipulated that the circumstances had not changed from May 1, with the exception of the testimony offered at trial by Jeremiah and Dakota.

Jeremiah and Dakota dated from 2008 to 2011. In June 2011, shortly after she became aware of her pregnancy, Dakota told Jeremiah that she was pregnant. However, following an argument, Dakota told Jeremiah that he was not the father and that she did not want Jeremiah to have anything to do with the pregnancy.

In October 2011, Dakota told an adoption agency that Jeremiah was the biological father of the child. A caseworker with the agency called Jeremiah in November to inform him that he was identified as the biological father by Dakota. She informed him that Dakota wanted to place the child up for adoption.

Jeremiah visited with the caseworker in person on November 30, 2011. She gave Jeremiah a letter informing him of his rights to object to the adoption and the procedures he needed to follow. At that time, Jeremiah told the caseworker that he opposed the adoption.

The child was born on February 9, 2012. On February 13, Jeremiah and Dakota briefly talked on the telephone. Dakota did not tell Jeremiah that the child had already been born. At the summary judgment hearing, she explained that she did not tell him that the child had been born, because she did not want him to know about the child's birth during the time he had to object to the adoption.

At the summary judgment hearing on May 1, 2012, Jeremiah testified that he wanted to have an active role in the life of the child. He admitted that he had not yet provided financial assistance for the child. However, during oral argument, Dakota's counsel conceded that Dakota never asked Jeremiah for financial assistance.

Jeremiah lives with his parents. He testified that he was working full time earning $12.50 per hour and had saved $2,000 in anticipation of the child's birth. Jeremiah's father testified that the entire family was supportive of Jeremiah and that the family would be available to provide whatever support Jeremiah needed in raising the child.

Jeremiah has been convicted of driving under suspension, obstructing an officer, and trespassing. He testified that he had also been charged with, but not convicted of, theft, criminal mischief, and trespassing. During direct examination, Jeremiah was not completely forthcoming about his charges and convictions.

Dakota's testimony from the summary judgment hearing indicated that she was worried about Jeremiah's fitness to raise the child. She alleged that Jeremiah smoked marijuana daily and that he admitted to snorting cocaine. Dakota testified that she felt threatened by Jeremiah because he would often yell at her and call her names. Dakota's current significant other also testified to the verbal abuse and threatening language. Dakota explained that in December 2008, Jeremiah put Dakota on the bed, grabbed her wrists, and gave her a "black lip" with his elbow. Dakota testified that she did not contact the police after that incident. Under oath, Jeremiah denied all drug use, verbal abuse, and physical abuse.

At trial, Jeremiah and Dakota again briefly testified. Both confirmed that Jeremiah had not given any financial support to the child since the previous hearing. Jeremiah testified that he has spent some of the $2,000 he had saved, but that he still had over $1,000 saved for the support of the child. He reiterated it was his intent to seek custody of the child.

## County Court's Order

The county court found that Dakota intentionally hid the child's birth from Jeremiah. Therefore, Dakota was equitably estopped from relying on the 5-day time limit for objections. Additionally, Dakota could not rely on the procedural exceptions to requiring consent found under subparagraphs (7) and (8) of Neb. Rev. Stat. § 43-104.22 (Reissue 2008).

The county court held that Jeremiah's consent to any proposed adoption of the minor child is required. It stated that "[w]hile it is clear that [Jeremiah] has not provided support to the child either during pregnancy or since birth given the conduct of [Dakota] the court cannot find that [Jeremiah's] lack of response was unreasonable." Dakota now appeals that finding.

## ASSIGNMENT OF ERROR

Dakota assigns only that the county court erred when it concluded that Jeremiah's consent is required for the proposed adoption of the minor child, because exceptions under § 43-104.22 apply.

[1] Although Dakota's assignments of error state that all of the exceptions under § 43-104.22 apply, her brief clarifies that subparagraphs (6), (7), (8), (9), (10), and (11) are not applicable to this appeal and will not be argued. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court.[3] Therefore, we will address only the first five subparagraphs of § 43-104.22.

## STANDARD OF REVIEW

[2,3] Appeals in adoption proceedings are reviewed by an appellate court for error appearing on the record.[4] When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.[5]

[4] Where credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give great weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another.[6]

## ANALYSIS

[5-8] The interest of parents in the care, custody, and control of their children is perhaps the oldest of the fundamental liberty interests recognized by the U.S. Supreme Court.[7]

---

[3] *State v. Ely*, 287 Neb. 147, 841 N.W.2d 216 (2014).

[4] *Carlos H. v. Lindsay M.*, 283 Neb. 1004, 815 N.W.2d 168 (2012).

[5] *Id.*

[6] *Caniglia v. Caniglia*, 285 Neb. 930, 830 N.W.2d 207 (2013).

[7] See *Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000).

Recognizing these constitutional interests, the foundation of Nebraska's adoption statutes is the consent of a biological parent to the termination of his or her parental rights.[8] In particular, in order to terminate a father's rights through an adoption procedure, the consent of the adjudicated father of a child born out of wedlock is required for the adoption to proceed unless the Nebraska court having jurisdiction over the custody of the child determines otherwise, pursuant to § 43-104.22.[9] Section 43-104.22 states in part:

> At any hearing to determine the parental rights of an adjudicated biological father or putative biological father of a minor child born out of wedlock and whether such father's consent is required for the adoption of such child, the court shall receive evidence with regard to the actual paternity of the child and whether such father is a fit, proper, and suitable custodial parent for the child. The court shall determine that such father's consent is not required for a valid adoption of the child upon a finding of one or more of the following:
>
> (1) The father abandoned or neglected the child after having knowledge of the child's birth;
>
> (2) The father is not a fit, proper, and suitable custodial parent for the child;
>
> (3) The father had knowledge of the child's birth and failed to provide reasonable financial support for the mother or child;
>
> (4) The father abandoned the mother without reasonable cause and with knowledge of the pregnancy;
>
> (5) The father had knowledge of the pregnancy and failed to provide reasonable support for the mother during the pregnancy.

Because § 43-104.22 can effectively terminate the parental rights of the father, the exceptions under § 43-104.22 must be proved by clear and convincing evidence.[10]

---

[8] *In re Adoption of Jaden M.*, 272 Neb. 789, 725 N.W.2d 410 (2006).

[9] *In re Adoption of Corbin J.*, 278 Neb. 1057, 775 N.W.2d 404 (2009).

[10] See *In re Interest of Hope L. et al.*, 278 Neb. 869, 775 N.W.2d 384 (2009).

A BANDONMENT /N EGLECT OF C HILD

[9-12] Dakota argues that Jeremiah has abandoned the child because he has failed to make a genuine effort to provide child assistance. Section 43-104.22(1) states that "[t]he father abandoned or neglected the child after having knowledge of the child's birth." Willful abandonment has been defined as a voluntary and intentional relinquishment of the custody of the child to another, with the intent to *never again* claim the rights of a parent or perform the duty of a parent; or, second, an intentional withholding from the child, without just cause or excuse, by the parent, of his presence, his care, his love and his protection, maintenance, and the opportunity for the display of filial affection.[11] The question of abandonment is largely one of intent to be determined in each case from all the facts and circumstances.[12] Evidence of a parent's conduct is relevant to a determination of whether the purpose and intent of that parent was to abandon the child.[13] The issue of abandonment in an adoption proceeding must be established by clear and convincing evidence.[14]

The evidence supports the county court's finding that this exception to consent was inapplicable. The record indicates that upon being told definitively that the child was his, Jeremiah repeatedly attempted to communicate with Dakota about the well-being of the child. After receiving notice of the birth, he immediately objected to the adoption, and he testified at trial that it was his intent to gain custody.

Although Jeremiah failed to provide assistance for the child, such evidence alone is insufficient to establish that he intended to never again claim his parental rights. The record establishes that Dakota's actions hindered Jeremiah's attempts to provide assistance by refusing to return his telephone calls and by making it obvious that she wanted Jeremiah to have nothing to do with the child. The record also establishes that Jeremiah

---

[11] *In re Adoption of David C*., 280 Neb. 719, 790 N.W.2d 205 (2010).

[12] *Id*.

[13] *Id*.

[14] *Id*.

has repeatedly expressed intent to be actively involved in the child's life.

Considering all of the evidence and giving weight to the county court's factual findings, we hold that the county court did not err in finding that Dakota failed to establish by clear and convincing evidence that Jeremiah neglected or abandoned the child. The finding is supported by competent evidence and is neither arbitrary, capricious, nor unreasonable.

## Fit, Proper, and Suitable

Dakota argues that Jeremiah is not a fit, proper, and suitable custodial parent for the child, because he has an unstable work history, a history of drug abuse, a history of verbal and physical abuse, and a criminal record.

[13,14] Section 43-104.22(2) states that consent is not required if "[t]he father is not a fit, proper, and suitable custodial parent for the child." We have not defined "fit, proper, and suitable" in the context of § 43-104.22. However, we have defined parental unfitness in the context of termination of parental rights cases as a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's well-being.[15] Unfitness must be proved by clear and convincing evidence.[16]

Dakota asserts that Jeremiah is unfit because he has smoked marijuana and snorted cocaine. She also claims that Jeremiah was physically and verbally abusive. Jeremiah denied both of these allegations under oath. Although the county court did not make a specific finding on this evidence, we give deference to its general finding that this did not clearly and convincingly establish that Jeremiah was unfit. In this instance, it appears credible evidence was in conflict. Therefore, we give weight to the fact that the county court generally accepted Jeremiah's version of the facts.

---

[15] *In re Interest of Kendra M. et al.*, 283 Neb. 1014, 814 N.W.2d 747 (2012).

[16] See *id*.

Additionally, Dakota argues that Jeremiah has an unstable work history. But Jeremiah had a full-time job for 7 months prior to the summary judgment hearing and was earning $12.50 per hour. Although he did not earn a lot of money, Jeremiah had at one point saved over $2,000 in order to take care of the child. Although his job history may not be ideal, the evidence indicates that Jeremiah is now working a stable job. And in any event, low income or an unstable job history does not alone establish parental unfitness.

Finally, Dakota argues that Jeremiah is unfit because of his criminal history. However, his convictions are relatively minor and none of the crimes speak directly to his ability to be a fit parent for the child. The record indicates that the convictions occurred 3 years prior to the summary judgment hearing, when Jeremiah was age 18, and Jeremiah testified that he has matured since the convictions. Although convictions are to be taken seriously, the county court did not err in determining that they were insufficient to determine Jeremiah to be unfit.

After giving deference to the county court's credibility determinations concerning the accusations of drug use and physical and mental abuse, we find Dakota did not prove parental unfitness by clear and convincing evidence under § 43-104.22(2).

### Failed to Provide Reasonable Financial Support

Next, Dakota argues that Jeremiah has failed to provide reasonable financial support. Section 43-104.22(3) states that consent for adoption is not required if "[t]he father had knowledge of the child's birth and failed to provide reasonable financial support for the mother or child."

It is uncontested that Jeremiah did not provide financial support for Dakota or the child. However, the county court's order directly addresses this issue. The county court stated that "[w]hile it is clear that [Jeremiah] has not provided support to the child either during pregnancy or since birth given the conduct of [Dakota] the court cannot find that [Jeremiah's] lack of response was unreasonable." In other words, Dakota made it very difficult for Jeremiah to provide financial support.

Dakota deliberately hid the birth of the child from Jeremiah. She did not answer or return his telephone calls. Jeremiah testified that he attempted to contact Dakota because he wanted to provide her with financial support. Jeremiah testified that he saved money for the child and acknowledged that he would pay back child support if the adoption did not go through.

We do not take issue with the county court's finding that Jeremiah's failure to provide reasonable financial support was excused because of the conduct of Dakota. We have previously stated that the adoption statutes do not allow a mother to singlehandedly sever a relationship between a father and child, no matter what the quality of that relationship is.[17] Dakota clearly does not want to have Jeremiah in the life of the child, and she chose to not provide Jeremiah with a fair opportunity to offer financial support. If the county court were to allow Dakota to actively deter Jeremiah from providing financial support and then terminate his rights on those grounds, the court would be allowing mothers to refuse assistance in an attempt to terminate the parental rights of unwed fathers. Therefore, we find no error in the county court's determination that Dakota's conduct excuses Jeremiah's failures.

### Abandoned/Failed to Financially Support During Pregnancy

For her final argument, we have grouped subparagraphs (4) and (5) of § 43-104.22. Dakota argues that Jeremiah abandoned her and failed to provide financial support during her pregnancy. Section 43-104.22(4) states that "[t]he father abandoned the mother without reasonable cause and with knowledge of the pregnancy." Likewise, § 43-104.22(5) states that "[t]he father had knowledge of the pregnancy and failed to provide reasonable support for the mother during the pregnancy." Both exceptions require that the father had knowledge of the pregnancy.

Here, the evidence indicates that for the majority of the pregnancy, Dakota told Jeremiah that he was not the father.

---

[17] *In re Application of S.R.S. and M.B.S.*, 225 Neb. 759, 408 N.W.2d 272 (1987).

Jeremiah did not receive formal notice that he was the purported father until November 2011. The evidence indicates that once he received notice, Jeremiah made attempts to contact Dakota to discuss the pregnancy, which are confirmed by telephone records. A caseworker with the adoption agency testified that Jeremiah had asked her questions about the pregnancy so that he could protect his parental rights.

The county court found that Dakota intentionally hid her pregnancy and the birth of the baby from Jeremiah in an attempt to procedurally bar him from objecting to the adoption. This finding is not appealed by Dakota.

Considering the entire record as presented, we find that competent evidence supports the county court's finding that Jeremiah was excused for not providing financial support during Dakota's pregnancy because of Dakota's actions to not include him in her pregnancy.

## CONCLUSION

The county court's finding that Dakota did not prove by clear and convincing evidence that Jeremiah's consent was not required under § 43-104.22 is well supported by competent evidence. The decision of the county court is affirmed.

Affirmed.

---

Carolyn Carlson and Richard Carlson, appellants, v.
Allianz Versicherungs-Aktiengesellschaft and
Does 1 through 50, inclusive, appellees.

___ N.W.2d ___

Filed March 7, 2014.    No. S-13-492.

1. **Motions to Dismiss: Appeal and Error.** A district court's grant of a motion to dismiss is reviewed de novo.
2. **Appeal and Error.** To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error.
3. **Declaratory Judgments: Courts: Jurisdiction: Parties: Waiver.** The presence of necessary parties in declaratory judgment actions is jurisdictional and cannot be waived, and if such persons are not made parties, then the district court has no jurisdiction to determine the controversy.