IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE ADOPTION OF RILEY L.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE ADOPTION OF RILEY L., A MINOR CHILD.

ALISHA B. AND JACOB B., APPELLEES,

V.

ROBERT S., APPELLANT.

Filed April 7, 2015.    No. A-14-689.

Appeal from the County Court for Lincoln County: MICHAEL E. PICCOLO, Judge. Affirmed.

Patrick M. Heng, of Waite, McWha & Heng, for appellant.

James R. Korth, of Reynolds, Korth & Samuelson, P.C., L.L.O., for appellees.

MOORE, Chief Judge, and IRWIN and RIEDMANN, Judges.

MOORE, Chief Judge.

### INTRODUCTION

Robert S. appeals from the order of the county court for Lincoln County, which found that Robert's consent was not required for the adoption of Robert's out-of-wedlock minor child with Alisha B. by Alisha's husband Jacob B. due to Robert's abandonment of the child. Finding no error in the county court's decision, we affirm.

### BACKGROUND

Alisha and Robert are the biological parents of Riley L. Alisha and Robert have never been married to one another, but they were in a relationship and living together at the time Riley was conceived. They continued to live together until Alisha was at least 7 months pregnant, at which

time, Robert asked her to move out of his home. Riley was born in May 2007. Alisha married Jacob in January 2013.

On November 25, 2013, Jacob, joined by Alisha, filed a petition in the county court, seeking to adopt Riley. Jacob alleged that Robert was Riley's father and that Robert's consent was not required for the adoption because Robert had abandoned Riley as contemplated by Neb. Rev. Stat. § 43-104(2) (Reissue 2008). Alisha's consent to the adoption was attached as an exhibit to the petition. Jacob also filed a motion for determination of abandonment, alleging that Robert abandoned or neglected Riley after having knowledge of his birth, that Robert had knowledge of Riley's birth and failed to provide reasonable financial support for Alisha or Riley, that Robert abandoned Alisha without reasonable cause and with knowledge of the pregnancy, and that he had knowledge of the pregnancy and failed to provide reasonable support for Alisha during the pregnancy.

On January 17, 2014, Robert was officially served with a copy of the petition for adoption, motion for determination of abandonment, and other related pleadings. On January 27, he attended a hearing before the county court on abandonment and adoption. At that time, he objected to the hearing, advised the court of his intention to hire counsel, and requested a continuance. The court granted Robert's request, and it also appointed a guardian ad litem for Riley.

Alisha and Robert provided DNA samples for genetic testing, and the results of that testing, which became available in April 2014, showed a 99-percent probability that Robert is Riley's father.

The county court bifurcated the adoption proceedings and heard the issues of abandonment and consent on May 19, 2014. The court heard testimony from the guardian ad litem, Alisha, Alisha's stepfather, and Robert, and received copies of the DNA test results and Facebook postings made by Robert.

Upon confirmation of her pregnancy by her doctor, Alisha shared a copy of the pregnancy test report with Robert. She also informed him of her prenatal healthcare provider and the baby's approximate due date. According to Alisha, she never suggested to Robert that anyone else was the child's father and he conducted himself as if he were the father. Specifically, Alisha testified that Robert talked about providing insurance for the baby through his work and that they planned on fixing up a room in Robert's house for the baby. Robert did not recall any conversation about his insurance.

Around the seventh month of Alisha's pregnancy when Robert asked her to move out, Alisha contacted her mother and stepfather to help her move. According to Alisha, when she was removing her belongings from Robert's house, he told her that he was "going to be a nobody" to the baby.

Alisha lived with her parents from the time she moved out of Robert's house until at least 4 months after Riley's birth. After the birth, she remained living in the area, and at the time of trial, she had been living in the same house for 6 years.

Neither Alisha nor anyone in her family notified Robert when Riley's birth occurred, and Robert was not present for the birth. When asked why she did not list him or anyone else as the father on the birth certificate, Alisha testified, "He wasn't there through the end and after we had

split, he hadn't contacted me, so I didn't see the reason for him to be on there." She testified that his statement that the child would be "a nobody" to him also factored into her decision.

Alisha testified that other than two messages left by Robert on her Facebook page in January and February 2010, she has not had any contact with or communication from Robert since they broke up during her pregnancy. In the January posting, Robert asked about the status of his relationship with Alisha and the well-being of the "precious life we created together." He again inquired about the status of the relationship in February. Alisha did not respond to the messages Robert left on her Facebook page. Robert has not provided any financial support for Alisha or Riley since she left his house. Robert has never made a direct request asking to be involved in Riley's life. Robert has never called Riley or sent him any presents, letters, or cards. Alisha admitted on cross-examination that she has never requested any financial support from Robert or made any contact with him concerning Riley, other than filing the adoption petition.

Robert testified that he knew Alisha was pregnant and had some idea of her approximate due date, but he had some doubts as to whether he was the baby's father. During their cohabitation, Robert accused Alisha of seeing other men. He testified that in the period after their relationship ended and prior to the birth, he did not provide any financial support because he did not know where Alisha was. Robert continued to live in the house he had shared with Alisha until July 2008, when he moved to Colorado. Robert was aware of a specific term in Alisha's probation order after she had "gotten into a little bit of trouble" that required her to live with her mother and stepfather. Robert knew where Alisha's parents lived and had been there during the course of their dating relationship. Although not notified of Riley's birth, within about a month of the child's presumed birth, Robert contacted an attorney and obtained a copy of the minor child's birth certificate. Upon learning that he was not listed as the child's father, Robert felt that indicated he was not the father. Robert testified that he hired the attorney because he intended to have a DNA test done, but was told there was nothing he could do since his name was not listed as the father.

Following Riley's birth, Robert claimed that he attempted to contact Alisha by placing a telephone call to her every couple of months, but was unsuccessful. He also testified that he texted her. He did not have any phone records or text message transcriptions to support this testimony. He did not try to call or contact any of Alisha's family members. He claimed that he did not actually know until January 2014 when he was served the adoption petition that he had a child and that prior to then, he thought Alisha's child was a girl. Sometime in early January 2010, Robert viewed Alisha's Facebook page, which at that time posted a picture of a small child. Robert testified that he thought the picture was of a little girl and he "hoped it was mine." He testified further that when he saw the picture, "[R]ight away my heart s[a]nk, I thought, maybe, holy smokes." Robert reacted by posting comments and statements to Alisha's Facebook page in January and February. Robert testified that his message in January was an attempt to "bait" Alisha into telling him whether the child was his. According to Robert, he continued his efforts toward contacting Alisha by telephone, but these attempts were unsuccessful.

Robert agreed he has not provided any financial support for Riley, but he testified, "I would have loved to, but I didn't know. I still don't know where [Alisha] lives." He testified that in order to obtain the exact address to send Riley a letter, he would have had to drive to Nebraska.

According to Robert, he has never claimed that he did not want to have anything to do with the child after its birth and had never told anyone if he were the father he would not perform parental duties. He testified that if anyone had ever requested financial assistance for Riley and proven he was the father, he would have willingly provided assistance.

In November or December 2013, Robert received a telephone call from Jacob's attorney, regarding relinquishment of parental rights. He testified that Jacob's attorney was "very vague," and Robert did not recall stating at that time that he was going to speak with an attorney. He testified that he did not know an adoption petition was being filed with regard to Riley at that time.

Robert testified about his juvenile criminal history, which included incidents of shoplifting, fighting at school, taking the vehicle of a friend's father "for a little spin," and a bank robbery when he was 17. According to Robert, he has not been convicted of any crimes or engaged in any criminal activity since the bank robbery, which occurred almost 19 years before the adoption hearing.

Robert was divorced in 2004 and was awarded custody of his daughters from that relationship in 2007.

On June 30, 2014, the county court entered an order, finding clear and convincing evidence that Robert abandoned Riley and accordingly, that his consent was not required for the adoption. Robert subsequently perfected his appeal to this court.

## ASSIGNMENTS OF ERROR

Robert asserts, consolidated and restated, that the county court erred in finding that his consent was not required for Riley's adoption because he abandoned Riley.

## STANDARD OF REVIEW

Appeals in adoption proceedings are reviewed by an appellate court for error appearing on the record. *Jeremiah J. v. Dakota D.*, 287 Neb. 617, 843 N.W.2d 820 (2014). When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id.*

## ANALYSIS

Robert asserts that the county court erred in finding that his consent was not required for Riley's adoption because he abandoned Riley.

The interest of parents in the care, custody, and control of their children is perhaps the oldest of the fundamental liberty interests recognized by the U.S. Supreme Court. *Jeremiah J. v. Dakota D., supra*. The foundation of Nebraska's adoption statutes is the consent of a biological parent to the termination of his or her parental rights. *Id.* In order to terminate a father's rights through an adoption procedure, the consent of the adjudicated father of a child born out of wedlock is required for the adoption to proceed unless the Nebraska court having jurisdiction over the custody of the child determines otherwise, pursuant to Neb. Rev. Stat. § 43-104.22 (Reissue 2008). *Id.* Because § 43-104.22 can effectively terminate the parental rights of a father, the exceptions under § 43-104.22 must be proved by clear and convincing evidence. *Id.*

Section 43-104.22 provides, in part:

At any hearing to determine the parental rights of an adjudicated biological father or putative biological father of a minor child born out of wedlock and whether such father's consent is required for the adoption of such child, the court shall receive evidence with regard to the actual paternity of the child and whether such father is a fit, proper, and suitable custodial parent for the child. The court shall determine that such father's consent is not required for a valid adoption of the child upon a finding of one or more of the following:

(1) The father abandoned or neglected the child after having knowledge of the child's birth;

(2) The father is not a fit, proper, and suitable custodial parent for the child;

(3) The father had knowledge of the child's birth and failed to provide reasonable financial support for the mother or child;

(4) The father abandoned the mother without reasonable cause and with knowledge of the pregnancy;

(5) The father had knowledge of the pregnancy and failed to provide reasonable support for the mother during the pregnancy. . . .

The county court in this case determined that Robert's consent was not required because he abandoned Riley. Willful abandonment has been defined as a voluntary and intentional relinquishment of the custody of the child to another, with the intent to never again claim the rights of a parent or perform the duty of a parent; or, second, an intentional withholding from the child, without just cause or excuse, by the parent, of his presence, his care, his love and his protection, maintenance, and the opportunity for the display of filial affection. *Jeremiah J. v. Dakota D.*, 287 Neb. 617, 843 N.W.2d 820 (2014). The question of abandonment is largely one of intent to be determined in each case from all the facts and circumstances. *Id.* Evidence of a parent's conduct is relevant to a determination of whether the purpose and intent of that parent was to abandon the child. *Id.* The issue of abandonment in an adoption proceeding must be established by clear and convincing evidence. *Id.*

Neb. Rev. Stat. § 43-104(2) provides that "[c]onsent shall not be required of any parent who . . . has abandoned the child for at least six months next preceding the filing of the adoption petition." Although § 43-104 specifies the 6 months preceding the filing of the petition as the critical period of time during which abandonment must be shown, the Nebraska Supreme Court has stated that this statutory period need not be considered in a vacuum. See *In re Adoption of Simenton*, 211 Neb. 777, 320 N.W.2d 449 (1982). "One may consider the evidence of a parent's conduct, either before or after the statutory period, for this evidence is relevant to a determination of whether the purpose and intent of that parent was to abandon his child or children." *Id.* at 783, 320 N.W.2d at 453. The parental obligation "requires continuing interest in the child and a genuine effort to maintain communication and association with that child. Abandonment is not an ambulatory thing the legal effects of which a parent may dissipate at will by token efforts at reclaiming a discarded child." *Id.* at 784, 320 N.W.2d at 454. To prove abandonment in adoption proceedings, the evidence must clearly and convincingly show that the parent has acted toward the

child in a manner evidencing a settled purpose to be rid of all parental obligations and to forgo all parental rights, together with a complete repudiation of parenthood and an abandonment of parental rights and responsibilities. *In re Guardianship of T.C.W.*, 235 Neb. 716, 457 N.W.2d 282 (1990).

Robert argues that this case is similar to *Jeremiah J. v. Dakota D.*, 287 Neb. 617, 843 N.W.2d 820 (2014), where the Nebraska Supreme Court considered whether the father's consent was required before the mother could place their child born out of wedlock up for adoption. In that case, the mother became pregnant while the parties were dating. She told the father that she was pregnant, but after an argument, she told him he was not the father and did not want him to have anything to do with the pregnancy. The mother later informed an adoption agency that he was the father, and the agency contacted him and informed him of his right to object to the adoption and the procedures to follow. The father advised the agency caseworker he opposed the adoption. After the child's birth, the mother and father visited by telephone, but she did not tell him the child had already been born because she did not want him to know of the birth during the relevant period for objection to any adoption. Upon learning that the child was his, the father made repeated attempts to communicate with the mother about the child's well-being. The father did not provide any financial assistance for the child, but he was not asked by the mother to do so. He testified that he wanted to have an active role in the child's life.

The Nebraska Supreme Court stated that the father's failure to provide financial support, without more, was insufficient to establish an intent to never claim his parental rights. The Court found that the mother's actions hindered the father's attempts as she refused to return his calls and made it obvious she did not want him involved. The Court also noted the father's repeated expressions of intent to be involved in the child's life. The Court upheld the lower court's determination that the mother did not prove abandonment or neglect by clear and convincing evidence. 287 Neb. at 625.

Robert also urges us to compare his case to *In re Dylan Z.*, 13 Neb. App. 586, 697 N.W.2d 707 (2005), a termination of parental rights case. The child in that case was placed in foster care after being removed from the mother's home due to her drug use. During the course of the juvenile court proceedings with respect to the mother, she identified the father, and a caseworker for the Nebraska Department of Health and Human Services attempted to contact him by calling a telephone number provided by the mother. The caseworker called twice and although she never spoke to the father, she claimed to have left messages for him. The caseworker never attempted to contact the father in any other way. The father presented evidence that the number called was not correct and that he was unaware he was the child's father until he was served with a supplemental petition in the juvenile court case. Upon being served, the father contacted the Department, but he was denied visitation. This court found the record did not present clear and convincing evidence that the father intentionally abandoned the child; rather, the lack of contact was attributed directly to his lack of knowledge that he was the father.

Robert attempts to distinguish his case from *In re Interest of Gabriella H.*, 289 Neb. 323, 855 N.W.2d 368 (2014), in which the father's parental rights were terminated based on his abandonment of the child. In that case, the birth certificate did not identify the father, and he was not present for the child's birth. However, the mother had informed him that he might be the father.

The child was taken into custody by the Department upon her birth due to the mother's drug use. The mother identified the father as a potential father and he was approved to be present during visitation. The father did attend visitation for a period of time, but after he was incarcerated, he made no further attempts to be involved with the child, even though a caseworker sent a letter showing that DNA testing had established him as the father. The Supreme Court concluded that the father abandoned the child after being initially involved. The child was 20 months old at the time of the termination hearing, but the father had last seen her at 3 months. The Court found sufficient evidence of abandonment.

In this case, Alisha and Robert were dating and living together when Riley was conceived. He was aware of the pregnancy and projected birth date. He knew the name of Alisha's healthcare provider and the location of the planned birth. Robert accused Alisha of seeing other men, but the record shows no evidence that Alisha ever validated these suspicions. Nor does the record show that Alisha ever indicated that Robert may not be the father. The record also shows that Robert knew Alisha was required to live with her parents at the time he asked her to move out of his house and that he knew where her parents lived. Alisha remained living in the area after leaving her parents' house. There is no evidence that Alisha hid her location from Robert.

Robert contacted an attorney shortly after the child's projected birth date and learned that the name of the father was not listed on the birth certificate. From this, Robert concluded that he might not be the father. Alisha testified that she did not list a father because Robert was not present and because at the time of their separation, he told her he would be "a nobody" to the child. Robert took no further proactive steps to legally confirm paternity or to provide financial support for Riley. Robert posted a message on Alisha's Facebook page approximately 2½ years after Riley's birth inquiring about the welfare of "the precious life we created together," which Robert portrayed at trial as a fishing expedition to elicit a response from Alisha as to the child's paternity. We note that the county court found Robert's explanation at trial to be insincere and found the statement in Robert's message to Alisha to provide "an unequivocal verification of Robert's certainty about Riley's paternity."

The Nebraska Supreme Court has stated that in determining whether parental rights should be terminated based on abandonment, paternal uncertainty based on physical appearance of a child or suspicions of infidelity is not just cause or excuse for abandoning a child born into wedlock, especially when there are ample means to verify one's paternity. *In re Chance J.*, 279 Neb. 81, 776 N.W.2d 519 (2009). Although Riley was not born into wedlock, we find the proposition instructive in this case as the parties were living together at the time of Riley's conception. Robert's suspicion of infidelity was disputed by Alisha and does not excuse any abandonment. While Robert did take certain steps by contacting an attorney and checking the birth certificate shortly after Riley's birth, he did very little else to verify his paternity. He allegedly made calls to Alisha on a regular basis using a cell phone number she had at the time they were living together. He provided no documentation of these calls and there is no evidence in the record of Alisha having received and refused to return his calls. Robert knew where Alisha's parents lived and the name of at least one other family member, but he made no effort to contact them or to provide any form of support for Riley. He claimed that the only way he could have obtained an exact address to send something to Riley would have been to drive from Colorado to Nebraska. There is nothing in the record to

suggest that Alisha or anyone in her family deterred Robert's efforts or tried to hide Riley's parentage from Robert. In sum, Robert's argument that he could not have abandoned Riley because he did not know he was the father is not persuasive.

We conclude that there was clear and convincing evidence to support the county court's conclusion that Robert abandoned Riley and his consent was not required for Riley's adoption.

CONCLUSION

The county court did not err in concluding that Robert abandoned Riley and his consent was not required for Riley's adoption.

AFFIRMED.