In re Adoption of Madysen S. et al., minor children.
Nicole K. and William K., appellees,
v. Jeremy S., appellant.

___ N.W.2d ___

Filed October 20, 2015.    No. A-15-032.

1. **Adoption: Appeal and Error.** Appeals in adoption proceedings are reviewed by an appellate court for error appearing on the record.
2. **Judgments: Appeal and Error.** When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.
3. **Constitutional Law: Parental Rights.** The interest of parents in the care, custody, and control of their children is perhaps the oldest of the fundamental liberty interests recognized by the U.S. Supreme Court.
4. **Parental Rights: Adoption.** The foundation of Nebraska's adoption statutes is the consent of a biological parent to the termination of his or her parental rights.
5. **Adoption: Abandonment: Proof: Parental Rights.** To prove abandonment in adoption proceedings, the evidence must clearly and convincingly show that the parent has acted toward the child in a manner evidencing a settled purpose to be rid of all parental obligations and to forgo all parental rights, together with a complete repudiation of parenthood and an abandonment of parental rights and responsibilities.

Appeal from the County Court for Lincoln County: Michael E. Piccolo, Judge. Reversed.

Todd M. Jeffers, of Brouillette, Dugan & Troshynski, P.C., L.L.O., for appellant.

Angela M. Franz, of Waite, McWha & Heng, for appellees.

IRWIN, INBODY, and RIEDMANN, Judges.

INBODY, Judge.

## INTRODUCTION

Jeremy S., the biological father of Madysen S., Orion S., and Leo S., appeals the order of the Lincoln County Court finding that pursuant to Neb. Rev. Stat. § 43-104 (Reissue 2008), Jeremy had abandoned the children and his consent was not required for adoption of the children by their stepfather.

## STATEMENT OF FACTS

Jeremy and Nicole K. were married in September 2000. From that marriage, three children were born: Madysen in 2001, Orion in 2004, and Leo in 2005. In 2007, Madysen was interviewed by law enforcement regarding a report of sexual abuse perpetrated on her by Jeremy. Madysen reported that Jeremy sexually assaulted her on numerous occasions between December 2006 and March 2007. Jeremy was arrested, and Nicole and the children relocated from Missouri to Gage County, Nebraska. In July 2007, the Gage County District Court dissolved Jeremy and Nicole's marriage. Nicole was given custody of the children, and Jeremy was ordered to have no parenting time and to pay $50 per month in child support. In 2009, Jeremy was convicted in Missouri with three counts of first degree child molestation. In August 2009, Jeremy was sentenced to a total of 16 years' imprisonment and is currently incarcerated with the Missouri Department of Corrections.

In or around 2009 or 2010, Nicole met William K. and a relationship ensued. In January 2013, Nicole and William married. In May and June 2014, Nicole and William contacted Jeremy and requested that he voluntarily relinquish his parental rights to the three minor children and consent to their adoption by William. Jeremy refused their requests.

On August 5, 2014, Nicole and William filed verified petitions for adoption by a stepparent for Madysen, Orion, and

- 353 -

Decisions of the Nebraska Court of Appeals
23 Nebraska Appellate Reports
IN RE ADOPTION OF MADYSEN S. ET AL.
Cite as 23 Neb. App. 351

Leo. On the same day, Nicole and William filed petitions to terminate Jeremy's parental rights to all three children. The petitions to terminate alleged that Jeremy had abandoned the children and that termination of his parental rights was in their best interests. Jeremy filed answers to both the adoption and the termination filings, asking that the petitions be denied.

The petitions came before the county court in October 2014. Nicole testified that she was currently married to William and lived with him in Brady, Nebraska. Nicole testified that she was previously married to Jeremy and that they had three children: Madysen, who at the time of trial was 13 years old; Orion, who was 10 years old; and Leo, who was 8 years old. During the marriage, Nicole discovered that Jeremy was sexually abusing Madysen, who was 6 years old at the time. Nicole testified that at the time of trial, Jeremy was serving a total of 16 years' incarceration in Missouri for those crimes.

Nicole testified that Jeremy recently had a parole board hearing which she attended, during which she observed that Jeremy was not remorseful, as he laughed at the charges and could not answer many of the questions asked of him. Since the abuse, Madysen had spent 1½ years in counseling and experienced depression and confusion, in addition to anger. Nicole explained that now as a teenager, Madysen was returning to counseling because she had come to understand what Jeremy actually did and what that meant and was confused and hurt.

Orion was 3 years old when Jeremy left the family. Orion experienced anxiety issues and saw a counselor for 2 years for those issues. Nicole testified that Leo was a baby when Jeremy left and does not know Jeremy or exhibit any memories of him. Nicole testified that when she and Jeremy were married, Jeremy was not a good father and was often busy with video games or friends and was frequently unable to financially support the family because he spent money to buy "paintball" guns.

Nicole testified that in 2007 or 2008, she wrote a letter to the prison warden asking him to allow Jeremy visitation with the children at the request of Jeremy's family. Nicole also allowed Jeremy's extended family to have liberal visitation with the children whenever they wanted to see the children. Nicole testified that Jeremy pays $50 per month in child support and is current, although Nicole took issue with the payments because, she testified, Jeremy's child support was paid by his grandmother.

Nicole's current husband, William, had been a part of the family's life for 3 years, and Nicole testified that the children referred to him as "'Dad.'" Nicole explained she and the children had discussed the benefits of the adoption and determined that the children's having the same last name as everyone in their family would be less confusing and that they would not "have to lie" about their father any longer. Nicole testified that the children would also qualify for more military benefits available to William as adopted children versus stepchildren. Nicole opined that it was in the best interests of the children to terminate Jeremy's parental rights and allow William to adopt the children.

William is employed full time for the Department of Defense as a surface maintenance mechanic inspector. William testified that he had been involved in the children's lives since 2009 or 2010 and had been involved in several activities with them, such as teaching Leo to ride a bike, teaching Madysen to deer hunt, taking Leo and Orion fishing, and other parenting duties. William testified that the children referred to him as "'Dad.'" William explained that he wanted to adopt the children because he had acted as their father and wanted to legally take that responsibility.

Jeremy testified, explaining that his actions against Madysen were as a result of a "rough spot" he and Nicole were going through. Jeremy testified that a counselor told him he had somehow convinced himself that Madysen was a surrogate for Nicole, but that he is not a pedophile and has never molested

- 355 -

Decisions of the Nebraska Court of Appeals
23 Nebraska Appellate Reports
IN RE ADOPTION OF MADYSEN S. ET AL.
Cite as 23 Neb. App. 351

any other children. Jeremy testified that he regrets his actions every day and did not want to give up his parental rights to the children.

Jeremy testified that he might be released from incarceration in 2017 or 2019. Jeremy testified that he has completed several classes while incarcerated, including criminology, criminal thinking, victim impact, restorative justice, dealing with trauma, dealing with emotions, and anxiety and stress management. Jeremy also attends therapy once a week, and if he were conditionally released, he would be required to take a Missouri sex offender program lasting 9 to 18 months. Jeremy testified that he would like to see the children under supervised conditions when he is released.

Jeremy testified that since being incarcerated, he has sent the children birthday cards and letters and listened to the children in the background when he would be speaking with his family on the telephone, although he did not speak directly to the children. The last letters he sent were in June 2014, and he testified he received Father's Day cards from the children. Jeremy testified that he pays his child support. Jeremy testified that Nicole was preventing him from visiting the children, but admitted that he did not have any parenting time according to the dissolution decree. Jeremy testified that he signed the marital dissolution papers under duress and threat of solitary confinement.

Jeremy testified that it was not in the best interests of the children to terminate his parental rights, even though it might be 12 years until his possible release date, when he could see the children in person.

Jeremy's grandmother testified that she was at Jeremy's parole board hearing and that during the hearing, Jeremy was upset, but not disrespectful. She testified that the board was trying to provoke him. She testified that it is in the children's best interests that Jeremy retain his parental rights. She testified that occasionally when Jeremy called, she would allow him to be put on the telephone's loudspeaker to tell

- 356 -

Decisions of the Nebraska Court of Appeals
23 Nebraska Appellate Reports
IN RE ADOPTION OF MADYSEN S. ET AL.
Cite as 23 Neb. App. 351

the children that he loved and missed them. She testified that when she told the children that Nicole would not allow them to speak with Jeremy, the children would become upset. Jeremy's grandmother testified that, most recently in June, Jeremy had sent letters to the children. She testified that the children refer to Jeremy as "Daddy" and have sent him many holiday cards.

The children's guardian ad litem testified that she was the court-appointed guardian ad litem and had interviewed all of the interested parties in the case. She explained that she interviewed the children and found that there was little disclosure about a relationship with Jeremy. The children live in a family unit, and Leo appeared confused as to why he needed to be adopted by "his dad, because his dad is married to his mom." The guardian ad litem testified that Madysen was not confused and understood why Nicole was in favor of adoption.

The guardian ad litem testified that Jeremy was very passionate about wanting to have a relationship with the children, whenever that may be. She explained that Jeremy felt like he wanted to atone for his actions. However, as a result of the circumstances and the long-term effects on the children, it was in the best interests of the children that William be allowed to adopt them. She testified that in her experience, it is very difficult for children to reintegrate parents who have been incarcerated for long periods of time. Further, she explained that the children needed permanency, which would be difficult under these circumstances.

In a December 2014 order, the county court proceeded with the proceedings under Neb. Rev. Stat. § 43-101 et seq. (Reissue 2008). The court found that Jeremy did not relinquish his parental rights, was not deprived of his parental rights, and was not incapable of consenting to the adoption, which left only one issue: whether Jeremy had abandoned the children. The court found that the evidence was undisputed that Jeremy was unable to parent the children due to his incarceration, which was a result of his choice to sexually molest

- 357 -

Decisions of the Nebraska Court of Appeals
23 Nebraska Appellate Reports
IN RE ADOPTION OF MADYSEN S. ET AL.
Cite as 23 Neb. App. 351

Madysen over the course of several months. The court found that Jeremy had expressed remorse, expressed that he missed and loved the children, and expressed that he intended to attend a sex offender program while incarcerated, but it found that he was devoid of any moral sense or rectitude as to the children, as revealed by his committing the acts he did. The court found that Jeremy intentionally removed himself as a parent, withholding his presence, care, love, protection, guidance, and opportunity to display parental affection. The court found that these actions amounted to abandonment pursuant to § 43-104. The court found that as such, Jeremy's consent was not required and the previously appointed guardian ad litem for the children may provide any and all consents to the adoptions.

## ASSIGNMENT OF ERROR

Jeremy assigns the county court erred by finding that Jeremy had abandoned the children and that as such, his consent to the adoption of the children was not required.

## STANDARD OF REVIEW

[1,2] Appeals in adoption proceedings are reviewed by an appellate court for error appearing on the record. *Jeremiah J. v. Dakota D.*, 287 Neb. 617, 843 N.W.2d 820 (2014). When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id.*

## ANALYSIS

Jeremy argues that the county court erred by finding that the record showed he had abandoned the children, thereby relinquishing the requirement that he consent to the adoption of the children.

[3,4] The interest of parents in the care, custody, and control of their children is perhaps the oldest of the fundamental liberty interests recognized by the U.S. Supreme Court. *Id.*

- 358 -

Decisions of the Nebraska Court of Appeals
23 Nebraska Appellate Reports
IN RE ADOPTION OF MADYSEN S. ET AL.
Cite as 23 Neb. App. 351

The foundation of Nebraska's adoption statutes is the consent of a biological parent to the termination of his or her parental rights. *Id*.

[5] Section 43-104 states that no adoption can be decreed unless the petition is accompanied by parental consent or relinquishments, unless the party seeking adoption has established that the biological parent falls within one of the exceptions to consent. The section applicable to this appeal is § 43-104(2), which provides that "[c]onsent shall not be required of any parent who . . . has abandoned the child for at least six months next preceding the filing of the adoption petition." Although § 43-104 specifies the 6 months preceding the filing of the petition as the critical period of time during which abandonment must be shown, the Nebraska Supreme Court has stated that this statutory period need not be considered in a vacuum. See *In re Adoption of Simonton*, 211 Neb. 777, 320 N.W.2d 449 (1982). "One may consider the evidence of a parent's conduct, either before or after the statutory period, for this evidence is relevant to a determination of whether the purpose and intent of that parent was to abandon his child or children." *Id.* at 783, 320 N.W.2d at 453. The parental obligation "requires continuing interest in the child and a genuine effort to maintain communication and association with that child. Abandonment is not an ambulatory thing the legal effects of which a parent may dissipate at will by token efforts at reclaiming a discarded child." *Id.* at 784, 320 N.W.2d at 454. To prove abandonment in adoption proceedings, the evidence must clearly and convincingly show that the parent has acted toward the child in a manner evidencing a settled purpose to be rid of all parental obligations and to forgo all parental rights, together with a complete repudiation of parenthood and an abandonment of parental rights and responsibilities. *In re Guardianship of T.C.W.*, 235 Neb. 716, 457 N.W.2d 282 (1990).

This court is mindful of the inappropriate and criminal way in which Jeremy subjected his own daughter to sexual abuse.

However, the county court did not act as a juvenile court in proceedings terminating Jeremy's parental rights, but as a county court in adoption proceedings, through which the evidence must clearly and convincingly show that a parent has acted toward the child in a manner evidencing a settled purpose to be rid of all parental obligations and to forgo all parental rights, together with complete repudiation of parenthood and abandonment of parental rights and responsibilities; mere inadequacy is not the test. See *id.*

The record in this case provides evidence that although Jeremy is incarcerated, he has continually paid and is current with the child support obligation as ordered by the court in the dissolution decree, has sent letters and cards to the children, has adamantly refused to relinquish his parental rights, and has indicated that he does not wish to forgo parental obligations or parental rights. Jeremy's contact with the children through letters and cards fell within the 6 months immediately preceding the filing of the petition for adoption, and as noted, Jeremy was current on his child support obligation. The county court erred in finding that Jeremy had abandoned the children, because the record does not present clear and convincing evidence to prove abandonment pursuant to § 43-104(2). Therefore, the order of the county court must be reversed.

## CONCLUSION

Upon our review of the record, we conclude that the county court erred by terminating Jeremy's parental rights on the basis of abandonment pursuant to § 43-104(2) and by finding that Jeremy's consent was not required in order for William to adopt the children. Therefore, we reverse the county court's order.

REVERSED.