Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
02/10/2023 09:07 AM CST

IN RE ADOPTION OF FAITH F., A MINOR CHILD.
JERALD M. AND STACEY M., APPELLANTS,
V. KELLY B., APPELLEE.

___ N.W.2d ___

Filed February 10, 2023.    No. S-22-398.

1. **Interventions.** Whether a party has the right to intervene in a proceeding is a question of law.
2. **Judgments: Appeal and Error.** When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court.
3. **Adoption: Appeal and Error.** The standard of review in an appeal from a court's ruling on an adoption petition is error on the record.
4. **Judgments: Appeal and Error.** When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.
5. ____: ____. In instances when an appellate court is required to review cases for error appearing on the record, questions of law are nonetheless reviewed de novo on the record.
6. **Interventions.** As a prerequisite to intervention, the intervenor must have a direct and legal interest of such character that the intervenor will lose or gain by the direct operation and legal effect of the judgment which the court may render in the action.
7. **Standing: Words and Phrases.** Standing involves a real interest in the cause of action, meaning some legal or equitable right, title, or interest in the subject matter of the controversy.
8. **Adoption: Guardians and Conservators: Statutes.** The statutory scheme governing guardianship contemplates the involvement of the guardian in matters concerning the child, explicitly in adoption proceedings, and the direct operation and legal effect of an adoption of the child is the loss of a guardian's legal interest.

9. **Adoption.** Adoption proceedings were unknown to the common law and do not depend upon equitable principles.

10. **Adoption: Statutes.** Best interests are not specifically defined by Nebraska's adoption statutes.

11. **Adoption: Presumptions.** Neb. Rev. Stat. § 43-533(5) (Reissue 2016) does not set forth a legal presumption controlling a best interests analysis, nor does it limit the factors a trial court may consider in deciding whether granting a petition for adoption is in the child's best interests.

12. **Minors: Presumptions.** Rebuttable presumptions or determinative factors are generally disfavored in an analysis of a child's best interests.

13. **Minors.** In an analysis of a child's best interests, the weight to be given to any factor necessarily differs from case to case due to each factor's interrelation to other factors.

14. **Adoption.** The beneficial permanency of adoption is an important consideration that must be weighed in a best interests analysis under an adoption petition.

15. ____. Neb. Rev. Stat. § 43-533(5) (Reissue 2016) does not limit a court's flexibility under an adoption petition to make an individualized determination of the child's best interests.

16. ____. Reducing best interests to whether the first person to the courthouse with an adoption petition is good enough to carry out parental responsibilities for a child is inconsistent with the comprehensive and individualized consideration traditionally expected of trial courts in determining a child's best interests.

17. ____. The best interests of the child who is the subject of an adoption petition must remain a flexible and unique determination based on specific evidence relating to that child.

18. **Adoption: Guardians and Conservators.** In determining whether adoption is in a child's best interests, a court may consider the effect of adoption on preexisting family attachments and weigh the alternative of continuing the status quo of a guardianship.

Appeal from the County Court for Sarpy County: Todd J. Hutton, Judge. Affirmed.

Lisa M. Line, of Brodkey, Cuddigan, Peebles, Belmont & Line, L.L.P., for appellants.

Aimee S. Melton, Richard W. Whitworth, and Megan E. Shupe, of Reagan, Melton & Delaney, L.L.P., for appellee.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, STACY, FUNKE, PAPIK, and FREUDENBERG, JJ.

FREUDENBERG, J.

## I. INTRODUCTION

This case concerns a petition to adopt a minor child whose parents died as the result of a murder-suicide. The maternal grandfather and grandmother, who are divorced, share a temporary guardianship and conservatorship over the child whereby the child splits her time between the two households. The child's minor half sister resides solely with the maternal grandmother. Both children are receiving mental health treatment. After allowing the grandmother to intervene and present evidence in opposition to the adoption, the county court found it was not in the child's best interests to grant the petition. It explained that a coguardianship would keep intact the child's attachments with the family members of both households and the child "needs the security which comes from these attachments." The maternal grandfather and stepgrandmother appeal, arguing the grandmother lacked standing to intervene and the court erred in its best interests analysis. We affirm.

## II. BACKGROUND

At issue in this case is the petition by Dr. Jerald M. (Jerry) and Dr. Stacey M. to adopt Faith F., who was 7 years old at the time of the hearing on the petition. Jerry is Faith's biological maternal grandfather and Stacey is his wife. Faith's biological maternal grandmother, Kelly B., Jerry's ex-wife, objected to the adoption.

Faith's biological mother was Kari F. and her biological father was Zachary F. In September 2019, when Faith was 5 years old, Zachary murdered Kari and killed himself immediately thereafter. Faith was in the family home at the time and discovered her parents' bodies. Until that day, Faith had always lived with her parents and her half sister, Grace A., the biological child of Kari and her first husband. Grace was 12

years old at the time of the murder-suicide but was not in the home at the time of the incident.

Kari also had another child before her first marriage, Jaden R., who was 17 years old when Kari was killed. He lived with his father.

### 1. Kelly's and Jerry's Families

Kelly and Jerry were married in 1982 and divorced in 1987. Kari was born to the marriage, as well as her brother, Jerald M.

Kari was 3 years old and Jerald was 4 years old at the time of Kelly and Jerry's divorce. Kari and Jerald lived with Kelly after the divorce, and Jerry did not have much contact with Kari and Jerald when they were growing up.

Jerry had a second marriage and a third biological child, Joshua F., born of that marriage in 1989. That marriage ended in divorce.

Jerry and Stacey married in 1996, when Kari was approximately 12 years old. Two sons were born of Jerry and Stacey's marriage, the first in 1997 and the second in 2000.

Kelly had a third biological child in 1989, Katherine C., after her divorce from Jerry. Kelly thereafter married Karl B., Faith's stepgrandfather, in 1994, when Kari was 10 years old.

### 2. Kari's, Grace's, and Faith's Relationships With Jerry, Stacey, and Kelly Before Kari's Death

Kari lived with Kelly at various points of time in Kari's adult life. After ending her relationship with Jaden's father, Kari and Jaden lived with Kelly. Again, after Kari's divorce from her first husband, Kari and Grace lived with Kelly. This was during the first 5 years of Grace's life.

Kari married Zachary in 2012. Thereafter, Kari and Grace moved with Zachary to Alaska, where Zachary, who was a member of the military, was stationed. Jerry had "started talking to Kari . . . consistently" some years before. Faith was born in Alaska in 2014.

Kelly described that she visited Kari in Alaska several times. Kelly quit her job to care for Kari in Alaska when she was pregnant with Faith and suffering medical issues. Kelly then stayed to help care for Faith after she was born.

Kari, Zachary, Grace, and Faith moved to California when Faith was approximately 1 year old, when Zachary was transferred to that location. During the time they lived in California, Kari and Faith stayed with Kelly in Nebraska for approximately 4 months in 2017. Kari was preparing to go into officer's training with the Air Force but was ultimately unable to join.

While Kari was living in California, Kelly visited her numerous times. In December 2018, Kari was injured in a motor vehicle accident. Kelly stayed in California for about a week to help care for Grace and Faith during Kari's recovery.

Due to Kari's experiencing ongoing post-traumatic stress disorder from the accident, Zachary was given a humanitarian military transfer back to Nebraska. The family moved to Nebraska in February or March 2019. Kari and Zachary lived in base housing.

After Kari moved back to Nebraska, she began working for Jerry, who is a practicing dentist, at his dental office. Faith often accompanied Kari to work.

Jerry described that when not with a patient, he would spend time with Faith coloring in coloring books and carrying her around on his shoulders. He testified, "[W]hen I would be treating a patient, I would hear, Papa Jerry, where are you? And my assistant would look at me like, you're being paged. And we were very close . . . ."

According to Jerry's and Stacey's testimony, four to five nights a week, Kari and Faith spent the evening at their house until around 10 p.m. Kari and Faith occasionally spent the night. Grace accompanied Kari and Faith on visits occasionally, but she usually preferred to be with friends in base housing. Kari, Grace, and Faith also accompanied Jerry, Stacey, and Joshua on a couple of camping trips.

Kelly described that in the months after Kari and Zachary's move back to Nebraska, she sometimes babysat Faith.

### 3. Juvenile, Probate, and Guardianship Proceedings

#### (a) Initial Placements

Pursuant to orders of the separate juvenile court, the Department of Health and Human Services (DHHS) took temporary protective custody of Grace and Faith immediately following the murder-suicide. Faith was later adjudicated under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016).

DHHS initially placed both Grace and Faith with Kelly. However, due to an old and unfounded allegation, Kelly's husband, Karl, had been placed on DHHS' child abuse registry. On September 30, 2019, after DHHS discovered Karl's name on the registry, Grace and Faith were moved to Jerry and Stacey's home. Soon thereafter, Karl was able to get his name expunged from the registry, but the placement was not changed back.

#### (b) Testamentary Wills and Durable Powers of Attorney

Kari and Zachary had executed wills in 2017 nominating Kelly as guardian for Grace and Faith, with Katherine as a secondary nominee. Kari and Zachary also executed military durable powers of attorney appointing Kelly as attorney in fact to exercise all legal rights in connection with the maintenance, care, and education of their dependents if Kari and Zachary were incapacitated or missing.

In the wake of the murder-suicide, these legal documents were not immediately discovered. Kari and Zachary's home was designated a crime scene, and Kelly was unaware that a will had been executed. Thus, no acceptance of nomination was filed within 30 days after notice of guardianship proceedings, as required by Neb. Rev. Stat. § 30-2608(d) (Cum. Supp. 2022). Kelly was not notified of the wills until December

2019, after mediation. That same month, Kelly filed applications for informal probate and appointment as a personal representative of Kari's and Zachary's estates. Kelly was subsequently appointed personal representative.

### (c) Petitions for Guardianship and Adoption

In January 2020, Kelly filed in county court a petition for guardianship of Faith. In May, without notifying Kelly, Jerry and Stacey filed a petition for adoption in county court. Meanwhile, the separate juvenile court recognized Kelly, Jerry, and Stacey as intervenors in the juvenile proceedings.

### (d) Mediated Temporary Custody and Visitation

While disposition on the juvenile matter was pending, the juvenile court, in August 2020, ordered that Faith's custody was to remain with DHHS with temporary placement and visitation in accordance with a mediated agreement between Kelly, Jerry, and Stacey. Under the mediated temporary agreement, reached in June, Faith was to remain placed with Jerry and Stacey, who would be her temporary guardians and conservators, but Grace's placement would change to be with Kelly, who would be her temporary guardian and conservator. Faith would spend Wednesdays with Grace at Kelly's house, and the half sisters would alternate weekends being together at either Kelly's or Jerry and Stacey's house. The mediator noted the agreement between Kelly and Jerry and Stacey was "not easily reached," but all parties were "aware of the bond between [Grace and Faith] and want to ensure each family is an integral part of the girls['] lives moving forward."

### (e) Dismissal of Faith From Juvenile Court

In August 2020, Kelly became aware that Jerry and Stacey had filed the petition for adoption and she filed an objection in county court. Subsequently, Kelly moved in juvenile court

to transfer all proceedings relating to Faith to county court. In November 2020, the juvenile court dismissed Faith from juvenile court and discharged her from the custody of DHHS.

### (f) Temporary Coguardianship

Shortly thereafter, the county court appointed Jerry and Kelly as temporary coguardians and coconservators of Faith. The county court ordered that Faith continue to reside with Jerry and Stacey with visitation to continue under the mediated agreement.

The county court overruled a motion by Jerry and Stacey to dismiss, for lack of standing, Kelly's objection to their petition for adoption. The court reasoned that Kelly had standing as a coguardian, pursuant to Neb. Rev. Stat. § 30-2613(1)(c) (Reissue 2016).

### 4. Faith's Relationships During Temporary Coguardianship

By the time the hearing on the petition for and objection to adoption was held in January 2022, Faith was 7 years old and had been residing with Jerry and Stacey for over 2 years. During this time, Faith continued with the visitation plan, having her own bedroom at both Jerry and Stacey's house and at Kelly and Karl's house.

### (a) Kelly and Karl's Household

Kelly and one of Karl's daughters testified about Faith's activities and relationships in Kelly and Karl's household. Cousins around Faith's age visit when Faith visits, and Faith enjoys playing with them. Faith has a good relationship with Kelly and Karl. "Papa Karl" often takes Faith and her cousins outside to play and is "the go-to person to make forts."

Kelly testified she calls Faith "the little conqueror because she's always climbing things . . . give her a mountain, she'll do that." Kelly said that when Faith visits, "[s]he comes barreling through the door," "[s]he's very much at home," and

she "[a]lready has an agenda in her head what she's going to do."

Faith's room at Kelly and Karl's house is "very . . . girly" and filled with stuffed animals and other toys. She has a playhouse outside, a scooter, and a bike. Kelly testified that when Faith visits, Kelly fills the parental role of ensuring that Faith eats right, cares for her hygiene, and takes her medicines. Kelly was concerned that if Faith were adopted by Jerry and Stacey, her relationship with Faith would be damaged.

According to Kelly, Grace and Faith "are very important to one another" and make sure they have "sister time." Grace and Faith watch movies, draw, and do craft projects together. Family members acknowledged that the age gap between Grace and Faith meant they had not always been close, but since the murder-suicide, Grace included Faith more. They described affectionate interactions between Grace and Faith when Faith visited Kelly's house.

Kelly testified, "My desire is for the girls to remain together. And that is — that goes above whether Jerry has them or I have them. It really has nothing to do with me. It has everything to do with them." She relayed that Grace wanted Faith to live with them and believed Grace would be "very devastated" if Faith's time at the house became more limited. Kelly opined that the sibling relationship was very important to both Grace and Faith and that "if they don't have the time together, that relationship over time would fade more and more." Kelly thought that Jerry and Stacey's adopting Faith would be confusing and alienating for both Grace and Faith and that their "dynamics would just totally change completely."

(b) Jerry and Stacey's Household

Jerry and Stacey testified about Faith's activities and relationships in their household. Stacey described that Faith's toys reside everywhere in their house except the laundry room. Faith enjoys playing "dress up" and drawing. While in Jerry and Stacey's care, Faith has taken dance and swimming

lessons and gone on frequent outings to the library, parks, and the zoo. Faith has playdates with friends on the weekends she stays with Jerry and Stacey.

Faith is expected to help with chores like clearing the table and periodically moving toys back into the bedroom. According to Stacey, the job Faith takes most seriously is pushing the button to open the garage door: "[S]he gets very upset if anyone else pushes the button." Each night, as part of her bedtime routine, Jerry and Stacey read chapter books to Faith, which Faith "really likes."

Stacey described that Faith was doing "pretty well" in school. She reads at her grade level and likes parts of school, like physical education, art, and recess, but has some trouble focusing. Stacey helps Faith with her homework, saying "it takes a lot of patience and time." Most recently, Jerry and Stacey developed with Faith's therapist a plan of alternating 10-minute periods of homework and play. Faith sees a variety of specialists for her physical and mental health and has a treatment regimen. Stacey testified she cares for Faith as if she were her biological daughter and they have a good relationship, but Faith "always wants to be with Jerry," who is her "number one favorite playmate."

Jerry testified that in the wake of Kari and Zachary's deaths, he felt like he was Faith's "touchstone." Faith shared "very disturbing things" with him and did not want him to leave her side.

At the hearing, Jerry testified regarding his relationship with Faith: "I love her little soul. You know, she's just an incredible girl. . . . [S]he's got a lot of energy. She's funny. She is intelligent. She's artistic. . . . [S]he's just an amazing, amazing child." Faith calls Jerry "Papa Jerry," "dad," and "daddy." She has referred to both Jerry and Stacey as her "parents." Jerry testified that neither he nor Stacey asked Faith to refer to them as her mother and father.

Jerry and Stacey acknowledged that Faith had an important relationship with Kelly and the extended family on Kelly's

side. Jerry and Stacey had not had any contact with Grace since June 2020. They also were not in contact with Jaden.

Jerry described that he had been close to Grace throughout her childhood, but Grace was "very disturbed" after Kari's death. According to Jerry, Grace did not like living in their house. He attributed this to the structure they provided, including "devices on the phone to notify us in case there's a sexual predator or foul language that was being intercepted on her phone." Jerry explained that both Grace and Jaden had "pushed [them] away," but he believed they would be able to reconnect in the future.

Jerry acknowledged it was very difficult for Faith when Grace moved back to Kelly's house in June 2020. He explained that Faith "really wanted to be with her sister, but she wanted — she wanted her sister to be with us." Stacey reported that after Grace moved to Kelly's house around June 2020, Faith started sleeping in a separate bed in their master bedroom. Jerry said that Faith loves Grace, but she does not talk about her much unless they ask about her.

Jerry and Stacey testified that if allowed to adopt, they were committed to allowing continued contact between Faith and Kelly and her family, but did not know what kind of visitation schedule would be in Faith's best interests. Both Jerry and Stacey described Wednesday visitations as disruptive and difficult for Faith. Jerry explained that all parties had tried to be flexible with the pandemic and other exigencies, but the weekend visitation schedules "flip flop more than a house of pancakes" and the lack of structure had not been in Faith's best interests.

### 5. Testimony of Dr. Ann Taylor

Dr. Ann Taylor, a child and adolescent psychiatrist, testified on behalf of Jerry and Stacey. Taylor began treating Faith weekly in October 2019 and had also treated Grace. Taylor knew Jerry and Stacey, having had a "professional relationship" with them before she began treating the children. Jerry

and Stacey have participated in all therapy appointments. Kelly has participated since August 2021. Sessions have taken place over the internet, with Faith being physically present with Jerry.

Taylor recommended that Jerry and Stacey be allowed to adopt Faith. She opined within a reasonable degree of medical certainty that adoption by Jerry and Stacey is in Faith's psychological best interests. She described Faith as "very attached" to Jerry and Stacey, viewing Stacey as her mother and Jerry as her father. According to Taylor, Faith considered Jerry and Stacey's house as her home.

Taylor reported that Faith had shown improvement over the course of therapy, with the most significant progress in the 3 months prior to the hearing. During the time Faith had been living with Jerry and Stacey, "she's been able to start moving into normal childhood kind of issues and away from where am I going to live and am I going to be taken away."

According to Taylor, changing primary placement to Kelly "would be devastating." Taylor explained Faith's "attachment was damaged" by the murder-suicide of her parents. Taylor testified Faith is "attached to [Jerry and Stacey] as her primary caregivers" and a change in primary caregivers would "recreate trauma for her."

According to Taylor, Faith was not functioning very well in August 2020 when visitation with Kelly "changed pretty rapidly" and significantly increased. Taylor explained, "If she knows what's going to happen and that is what happens, she does well. If there are changes, she struggles with that. She likes to have a schedule be pretty consistent no matter what it is." Faith's anxiety has manifested through vomiting.

Taylor stated that with the degree of anxiety suffered by Faith, it is very important to get permanency, which here means adoption. With adoption, explained Taylor, Faith "will know who's in charge of her and what her future looks like."

Taylor did not consider guardianship permanency and, thus, did not consider guardianship in Faith's best interests.

Taylor could not opine on whether Faith, who at that time was 7 years old, understood the definition of adoption versus guardianship.

Taylor opined that it was important for Faith to maintain contact with her family members on Kelly's side of the family. Taylor opined it would be in Faith's best interests for her to be able to continue family relationships with Kelly, Faith's siblings, and her cousins on Kelly's side.

With respect to Faith's relationship with Grace, Taylor stated that the attachment was variable. Faith had reported in the past that Grace was "mean to her." Taylor did not elaborate but testified that Faith's struggles in her relationship with Grace go beyond normal sibling issues. Taylor described that DHHS' involvement with Grace prevented her from treating Grace and Faith together.

Although Taylor initially treated Grace separately, at the time of the hearing, she had not seen her for over a year, because DHHS had removed her as the treating psychiatrist. Taylor noted that Faith had reported being sad when Grace moved to Kelly's house and stopped visiting Jerry and Stacey, but Faith processed it as a "temporary loss." Taylor elaborated, "[T]here weren't any behavioral acting out or problems with that that you would have expected if it had been a huge impact."

### 6. TESTIMONY OF GUARDIAN AD LITEM

The guardian ad litem (GAL) also opined that Faith's adoption by Jerry and Stacey would be in Faith's best interests. The GAL believed Jerry and Stacey could provide Faith with the structure and permanency that goes along with knowing "who not only her primary caregivers are but who is going to be making decisions about her life, who is going to be the final arbiter of any decision that's made, who she can count on."

The GAL visited Faith at both Kelly and Karl's home and Jerry and Stacey's home. She observed that Faith was very comfortable in and "has a love of both homes."

The GAL elaborated Faith was very comfortable at Kelly's home, where she has her own room with "all sorts of toys and things." During the visit to Kelly's home, the GAL observed Faith "was having a great time playing in there." The GAL could not say anything negative about Kelly's home and noted that Faith enjoyed spending time with her cousins while at Kelly's home.

The GAL did not see Faith interact with Grace, who was at home in her room during the visit. The GAL understood that there did not appear to be a "cohesive sibling relationship" between Grace and Faith. The GAL testified that Dr. Glenda Cottam, who had evaluated Grace and done some counseling with Faith 2 years prior, had told the GAL "it would not be inappropriate" to split the siblings up for purposes of adoption, "given their relationship." However, Cottam had not seen the girls for approximately 2 years and, because Faith was only 5 years old when Cottam last saw her, had been "unable to do a really appropriate family dynamics evaluation." The GAL noted she had no reason to believe Grace and Faith had developed a bonded sibling relationship while they were not living together, stating, "I don't think it helps a bonded relationship that they're not living together. If they didn't have one before, I wouldn't have expected them to have a bonded relationship after a year or so of being separated."

The GAL noted that Jaden, who was an adult, did not have a relationship with Jerry and Stacey, explaining "there is a relitigation of old grievances that continues to go on and on and on." The GAL testified Jaden expressed concerns about Jerry and Stacey. The GAL did not elaborate what the grievances were but stated she took them into consideration in rendering her opinion.

The GAL testified Faith considered Jerry and Stacey's house her home. Faith was very comfortable there and seemed "very bonded" with Jerry.

The GAL reported she had asked Faith about whether she felt safe in each home. Faith responded that she did, but

volunteered that she felt "safer" in Jerry and Stacey's home. When asked who her favorite person in the world was, Faith responded "without skipping a beat" that it was "Papa Jerry." The GAL understood that Faith had become comfortable with Jerry during the time she spent in his dental office while Kari worked there and "was glued to him after the death of her parents." The GAL opined, "That bond remains. I could see that very clearly." Faith reported to her that Jerry made her laugh and made her feel comfortable. The GAL opined that breaking the bond between Faith and Jerry would be "horrendous" for her.

According to the GAL, the visitation schedule typical of parenting time was "not really appropriate to the situation." Because of the trauma Faith had suffered, going back and forth, especially on Wednesdays, was "disruptive of a structure and a schedule that I think only belongs in a parental relationship where you have parental bonds."

The GAL believed that Faith, like most children, needed "real permanency and they need to know where they're going to go every night, who they're going to be with every night, who makes their decisions for them, who can be manipulated, who can't be manipulated." The GAL was concerned that Faith "will not be able to move on or she will be impaired in her ability to get structure until she has real permanency." That real permanency, explained the GAL, "is someone she knows to be making all of her decisions for her like a parent would."

The GAL did not believe guardianships provided that kind of permanency. She did not know whether Faith knew the difference between an adoption and a permanent guardianship. Nevertheless, she explained:

> But what I can tell you is you have two separate households that are not parents. They're not parental authorities. They don't have parental bonds with this child. Somebody's got to establish those parental bonds with this child. And there can only really be in this case,

given her history, that she needs one place to look for stability.

The GAL did not have any concerns regarding Jerry and Stacey's ability to provide for Faith's ongoing needs.

The GAL opined it would be very harmful to Faith if Kelly was not able to have "grandparental type of contact with her." She "would hope that wouldn't happen in this case." But, "[u]nfortunately, you know, in any family, when there's parents, they can choose or not choose to exclude parties." There were, the GAL acknowledged, "no guarantees" with respect to Faith's continuing contact with Grace, Kelly, and her extended family, but she ultimately believed the risks of a permanent guardianship rather than adoption outweighed the benefits. In this regard, she opined that because Kelly and Jerry were "such different people" with "very differing parenting styles" and who "can agree on very little," "maintaining a guardianship is a nightmare scenario."

## 7. Order Denying Adoption

The county court sustained Kelly's objection to the petition for adoption, concluding that granting Jerry and Stacey's petition was not in Faith's best interests.

The court found that a close bond had been established between Faith and Kelly, Jerry, and Stacey. Grace and Faith are also "bonded but have differing needs."

With respect to Grace, the court elaborated the record was inadequate to "fully assess the current nature of the relationship between Faith and Grace." This was in part due to DHHS' decision to terminate Taylor's joint therapy sessions with Grace and Faith. Because of the secession of joint therapy, "it's unknown whether the children's therapeutic needs are evolving toward, away from or independent of each other." The court stated that "[t]his presents the court with a significant unknown, which in this court's judgment, causes everyone to either speculate on the future of their sibling relationship

or just ignore it." The court concluded that this was "unfair to Faith."

The court found that Faith was adjusting well to living with Jerry and Stacey. The court recognized that Faith had "strong feelings of abandonment" and it believed Faith's calling Jerry and Stacey "dad" and "mom" exemplified the "layers of emotions children process [when] traumatized by acts of violence."

The court found that Faith's "needs remain complex as she goes through attachment phases" and that she is "actively evaluating, processing, and assigning roles and occasionally testing limits while working through her emotions." It would be "therapeutically shortsighted to diagnose her immediate needs as representative of her future ones," and her "treatment will be necessarily ongoing and customized for her over time."

Noting that "[t]he certainty and structure of her surroundings and those to whom she relies for decision making authority aren't exclusive to the adoption process," the court concluded that "[h]aving guardians will keep intact the grandchild-grandparents' relationships she clearly needs." It found that Faith had "established relationships with each of these family members[,] but not to the exclusion of any of them," and that she "needs the security which comes from these attachments." The court said, "How the roles of Faith's family rearrange over time will be in large measure a result of Faith's therapeutic needs and personal preferences," which "remains an ongoing process."

The court concluded it was in Faith's best interests that she remain in the custody of Jerry and Stacey under the terms of the temporary coguardianship and visitation arrangement. The matter of a permanent guardianship was to be set for a hearing.

Jerry and Stacey appeal.

## III. ASSIGNMENTS OF ERROR

Jerry and Stacey assign that the county court erred in not finalizing Faith's adoption. They also more specifically assign the county court erred in determining Kelly had standing to object to the adoption and in failing to dismiss Kelly's objection on those grounds. Further, they specifically assign that the county court erred in determining adoption was not in Faith's best interests after failing to consider the correct factors in determining best interests, while at the same time finding it to be in Faith's best interests to remain in Jerry and Stacey's custody; incorrectly focusing on visitation with extended family as the controlling factor in the best interests analysis; and failing to consider the recommendation of the GAL.

## IV. STANDARD OF REVIEW

[1] Whether a party has the right to intervene in a proceeding is a question of law.[1]

[2] When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court.[2]

[3] The standard of review in an appeal from a court's ruling on an adoption petition is error on the record.[3]

---

[1] *Carroll v. Gould*, 308 Neb. 12, 952 N.W.2d 1 (2020).

[2] *Id.*

[3] See, Neb. Rev. Stat. § 43-112 (Cum. Supp. 2022); Neb. Rev. Stat. § 25-2733 (Reissue 2016); *Jeremiah J. v. Dakota D.*, 287 Neb. 617, 843 N.W.2d 820 (2014); *Carlos H. v. Lindsay M.*, 283 Neb. 1004, 815 N.W.2d 168 (2012); *In re Guardianship of T.C.W.*, 235 Neb. 716, 457 N.W.2d 282 (1990), *disapproved on other grounds, In re Adoption of Madysen S. et al.*, 293 Neb. 646, 879 N.W.2d 34 (2016); *In re Adoption of C.L.R. and J.M.R.*, 218 Neb. 319, 352 N.W.2d 916 (1984); *Peterson v. Jacobitz*, 29 Neb. App. 486, 955 N.W.2d 329 (2021). See, also, *In re Adoption of Kailynn D.*, 273 Neb. 849, 733 N.W.2d 856 (2007); *In re Adoption of Luke*, 263 Neb. 365, 640 N.W.2d 374 (2002); *In re Adoption of Leslie P.*, 8 Neb. App. 954, 604 N.W.2d 853 (2000).

[4] When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.[4]

[5] In instances when an appellate court is required to review cases for error appearing on the record, questions of law are nonetheless reviewed de novo on the record.[5]

## V. ANALYSIS

### 1. Standing to Intervene

We first address Kelly's standing under Neb. Rev. Stat. § 25-328 (Reissue 2016) to intervene in the adoption proceedings commenced by Jerry and Stacey. Section 25-328 provides:

> Any person who has or claims an interest in the matter in litigation, in the success of either of the parties to an action, or against both, in any action pending or to be brought in any of the courts of the State of Nebraska, may become a party to an action between any other persons or corporations, either by joining the plaintiff in claiming what is sought by the complaint, or by uniting with the defendants in resisting the claim of the plaintiff, or by demanding anything adversely to both the plaintiff and defendant, either before or after issue has been joined in the action, and before the trial commences.

[6,7] As a prerequisite to intervention, the intervenor must have a direct and legal interest of such character that the

---

[4] *State v. McGinn*, 303 Neb. 224, 928 N.W.2d 391 (2019), *modified on denial of rehearing* 303 Neb. 931, 932 N.W.2d 83; *Schinnerer v. Nebraska Diamond Sales Co.*, 278 Neb. 194, 769 N.W.2d 350 (2009). See, also, *Houser v. American Paving Asphalt*, 299 Neb. 1, 907 N.W.2d 16 (2018); *Schmunk v. Aquatic Solutions*, 29 Neb. App. 940, 962 N.W.2d 581 (2021); *State v. Keenan*, 28 Neb. App. 575, 946 N.W.2d 689 (2020), *modified on denial of rehearing* 28 Neb. App. 697, 946 N.W.2d 693; *Flodman v. Robinson*, 22 Neb. App. 943, 864 N.W.2d 716 (2015); *Lesser v. Eagle Hills Homeowners' Assn.*, 20 Neb. App. 423, 824 N.W.2d 77 (2012).

[5] *Stover v. County of Lancaster*, 271 Neb. 107, 710 N.W.2d 84 (2006).

intervenor will lose or gain by the direct operation and legal effect of the judgment which the court may render in the action.[6] An indirect, remote, or conjectural interest in the result of a suit is not enough to establish intervention as a matter of right.[7] Standing involves a real interest in the cause of action, meaning some legal or equitable right, title, or interest in the subject matter of the controversy.[8]

The county court held that Kelly has standing under her legal status as a temporary coguardian of Faith. We agree. By statute, a temporary guardian has the status of an ordinary guardian except that the guardianship authority is of limited duration.[9] Pursuant to Neb. Rev. Stat. § 30-2612 (Reissue 2016), by accepting appointment, "a guardian submits personally to the jurisdiction of the court in any proceeding relating to the guardianship that may be instituted by any interested person." Further, notice of any proceeding shall be delivered to the guardian. Under § 30-2613(1), "[a] guardian of a minor has the powers and responsibilities of a parent . . . ." A guardian is specifically empowered to "consent to the marriage or adoption of his or her ward."[10] Finally, a guardian's authority and responsibility terminates upon the minor's adoption.[11]

[8] The statutory scheme governing guardianship contemplates the involvement of the guardian in matters concerning the child, explicitly in adoption proceedings. And, by statute, the direct operation and legal effect of the adoption of that child is the loss of a guardian's legal interest. This confers standing.

---

[6] *Carroll v. Gould, supra* note 1.

[7] *Id.*

[8] *In re Interest of Enyce J. & Eternity M.*, 291 Neb. 965, 870 N.W.2d 413 (2015).

[9] See Neb. Rev. Stat. § 30-2611 (Reissue 2016).

[10] § 30-2613(1)(c).

[11] Neb. Rev. Stat. § 30-2614 (Reissue 2016).

We disagree with Jerry and Stacey's argument that the coguardians' being at odds as to whether the petition for adoption should be granted diminishes the legal character of Kelly's interest, as a guardian, in the proceedings. We also disagree with Jerry and Stacey's argument that because Kelly filed her objection before she was appointed coguardian—and never formally amended her objection or entered an appearance as coguardian—her status as coguardian should not be recognized in the adoption proceedings. There was no dispute that Kelly was Faith's coguardian. It was the same judge who entered the order appointing Kelly and Jerry as coguardians who specifically took notice of Kelly's status as coguardian in finding she had standing to intervene.

The county court did not err in finding Kelly had standing to participate as a party to the adoption proceedings. We need not address any additional grounds for standing proposed by Kelly. We turn to the merits of the court's judgment sustaining Kelly's objection and denying Jerry and Stacey's petition to adopt Faith.

## 2. Best Interests

[9] Adoption proceedings were unknown to the common law and do not depend upon equitable principles.[12] Of the various statutory conditions to a decree of adoption, at issue in this appeal is that the court find "such adoption is for the best interests of such minor child."[13] The county court found it was not in Faith's best interests to be adopted. We review the county court's determination for error appearing on the record,[14] which

---

[12] See *In re Petition of Ritchie*, 155 Neb. 824, 53 N.W.2d 753 (1952).

[13] See Neb. Rev. Stat. § 43-109(1) (Cum. Supp. 2022).

[14] See, § 43-112; § 25-2733; *Jeremiah J. v. Dakota D., supra* note 3; *Carlos H. v. Lindsay M., supra* note 3; *In re Guardianship of T.C.W., supra* note 3; *In re Adoption of C.L.R. and J.M.R., supra* note 3; *Peterson v. Jacobitz, supra* note 3. See, also, *In re Adoption of Kailynn D., supra* note 3; *In re Adoption of Luke, supra* note 3; *In re Adoption of Leslie P., supra* note 3.

means we review whether its decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.[15]

[10] Best interests are not specifically defined by Nebraska's adoption statutes,[16] and we have not elaborated on the best interests concept in our case law under petitions for adoption. Indeed, it does not appear we have ever addressed the merits of a determination of best interests made in that context.

It is not unusual for a state's statutory scheme to fail to define best interests for purposes of adoption.[17] This is because, as other courts have explained, the best interests standard does not have a precise meaning and must embrace a multitude of varied factual situations.[18] It has been said that the factors to be considered in determining a child's best interests are "legion" and "impossible to catalogue."[19]

Although best interests factors applicable to other proceedings may overlap with the factors considered in a best interests analysis under a petition for adoption, it is inappropriate to simply graft onto adoption statutes the factors, preferences, or definitions set forth in statutes or case law that governs other matters such as habeas corpus or custody in dissolution and

---

[15] See, *State v. McGinn, supra* note 4; *Schinnerer v. Nebraska Diamond Sales Co., supra* note 4. See, also, *Houser v. American Paving Asphalt, supra* note 4; *Schmunk v. Aquatic Solutions, supra* note 4; *State v. Keenan, supra* note 4; *Flodman v. Robinson, supra* note 4; *Lesser v. Eagle Hills Homeowners' Assn., supra* note 4.

[16] See *In re Adoption of Kassandra B. & Nicholas B.*, 248 Neb. 912, 540 N.W.2d 554 (1995) (Connolly, J., dissenting; Gerrard, J., joins).

[17] See Susan Nauss Exon, *The Best Interest of the Child: Going Beyond Legalese to Empathize with a Client's Leap of Faith*, 24 J. Juv. L. 1 (2004).

[18] See *Petition of D.I.S.*, 494 A.2d 1316 (D.C. App. 1985).

[19] *In re M.F.*, 1 S.W.3d 524, 532 (Mo. App. 1999) (internal quotation marks omitted).

dependency proceedings.[20] The factors considered should fully reflect the legal context in which the analysis of best interests is made.

Biological connections have generally been recognized as a significant consideration in evaluating whether granting a petition for adoption is in a child's best interests. In some cases, the biological relationship weighs in favor of the child's best interests, while in others, it could hinder it.[21] Keeping siblings or half siblings together is a relevant and important factor for the court to consider in an adoption case.[22] Although not directly applicable, the importance of this consideration is reflected in state statutes, including Nebraska's,[23] which provide for preferences for placement of siblings together in prospective adoptive or foster homes.[24]

In terms of evaluating the suitability of the proposed adoptive parents and their home, permissible considerations include psychological parentage[25]; continuity of care[26]; whether the adoptive parents will provide the child with good care and a stable home[27]; the ability of petitioners to meet the needs of

---

[20] See, *Matter of Adoption of Hannah L.*, 390 P.3d 1153 (Alaska 2017); *Brett M. v. Vesely*, 276 Neb. 765, 757 N.W.2d 360 (2008); *In re B.O.*, 177 P.3d 584 (Okla. Civ. App. 2007); *Petition of Schomer*, 89 Ill. App. 3d 92, 411 N.E.2d 554, 44 Ill. Dec. 432 (1980); *In re Dickhaus*, 41 Ohio Misc. 1, 321 N.E.2d 800 (1974).

[21] See *In re C.D.G.*, 108 S.W.3d 669 (Mo. App. 2002).

[22] See, *M.L.S. v. C.S.*, 710 S.W.2d 452 (Mo. App. 1986); 2 Ann M. Haralambie, Handling Child Custody, Abuse and Adoption Cases § 14:9 (Supp. 2022-23). See, also, *People in Interest of E.M.H.*, 873 N.W.2d 485 (S.D. 2015).

[23] Neb. Rev. Stat. § 43-1311.02 (Cum. Supp. 2022).

[24] See, e.g., Jill Elaine Hasday, *Siblings in Law*, 65 Vand. L. Rev. 897 (2012).

[25] *Petition of D.I.S., supra* note 18. See, also, e.g., *In re M.F., supra* note 19.

[26] *Petition of D.I.S., supra* note 18.

[27] *In re M.F., supra* note 19.

a child with a specific cultural, racial, and ethnic background[28]; the stability of the potential adoptive home[29]; and the age and health of the adoptive parents.[30]

Although Jerry and Stacey concede that if Kelly had presented a "competing adoption petition,"[31] Faith's biological connections to Kelly and Grace would be a proper consideration, they argue that when the court is presented with only one adoption petition, its analysis is more truncated. In such a situation, they argue the only factors appropriate to the court's best interests analysis are those pertaining to the fitness of the petitioners to parent the child.

Jerry and Stacey argue that the law presumes it to be in the best interests of a child without parental care to obtain the permanency of adoption as quickly as possible. Therefore, it must be presumed that granting the first qualifying adoption petition is in the child's best interests unless the petitioners are found to be unsuitable to the task of parenting that child. They acknowledge that Nebraska requires as a prerequisite to adoption that the child has resided with the petitioners for at least 6 months next preceding the entering of the decree of adoption.[32] They do not explain how the presentation of competing adoption petitions in Nebraska is possible.

In support of their argument that the court should focus only on the suitability of the prospective parents when presented with a singular petition for adoption, Jerry and Stacey rely on *G.S. v. T.B.*[33] The court in *G.S.* held, under a statute establishing a right of children to the permanence and stability of

---

[28] *Id.*

[29] *Id.*

[30] *In re Adoption of Tachick*, 60 Wis. 2d 540, 210 N.W.2d 865 (1973). See, also, Annot., 84 A.L.R.3d 665 (1978).

[31] Brief for appellant at 23.

[32] See § 43-109(1)(a).

[33] *G.S. v. T.B.*, 985 So. 2d 978 (Fla. 2008).

adoptive placements, the "focal issue [in a best interests analysis] is the fitness and appropriateness of the petitioners as adopting parents and . . . not whether the children should or should not be adopted or should live with the petitioners in some other form of custody such as guardianship."[34] According to the court, that determination was "made by the Legislature in favor of adoption over guardianship when adoption is available and serves the children's best interests."[35] The court held that a trial court abuses its discretion in denying an adoption petition when it determines the petitioners are fit prospective adoptive parents but denies the adoption despite this finding because it is in the child's best interests to ensure a grandparent's involvement in the child's life.[36]

Jerry and Stacey believe the Legislature has similarly mandated, through Neb. Rev. Stat. § 43-533(5) (Reissue 2016), a presumption in favor of adoption that can be rebutted only by a finding that the prospective adoptive parents are unfit or inappropriate. We disagree.

[11] Section 43-533(5) states:

When families cannot be reunited and when active parental involvement is absent, adoption shall be aggressively pursued. Absent the possibility of adoption other permanent settings shall be pursued. In either situation, the health, safety, and best interests of the child shall be the overriding concern. Within that context, preference shall be given to relatives for the permanent placement of the child.

By its plain language, § 43-533(5) does not set forth a legal presumption controlling a best interests analysis, nor does it limit the factors a trial court may consider in deciding whether granting a petition for adoption is in the child's best interests.

---

[34] *Id.* at 983.

[35] *Id.*

[36] See *G.S. v. T.B., supra* note 33.

NEBRASKA SUPREME COURT ADVANCE SHEETS

Section 43-533(5) provides that when pursuing either adoption or "other permanent settings," the best interests of the child shall be the "overriding concern."

[12,13] Rebuttable presumptions or determinative factors are generally disfavored in an analysis of a child's best interests.[37] It has been said that no single factor should be allowed to outweigh all others.[38] This is because the weight to be given to any factor necessarily differs from case to case due to each factor's interrelation to other factors.[39] Courts emphasize that best interests must remain a flexible and unique determination based on specific evidence relating to that child.[40] If the Legislature had wished to set forth a rebuttable presumption that adoption is in the child's best interests, it could have clearly set forth such a provision, but it did not.

[14,15] Certainly, the beneficial permanency of adoption is an important consideration that must be weighed in a best interests analysis under an adoption petition. However, we cannot predetermine, as a matter of law, how that factor might interrelate to other factors presented under the facts specific to the child in question. In the end, under both §§ 43-533(5) and 43-109, the paramount consideration that must be made before an adoption is "possible" is that it is in the child's best interests to grant the petition. Section 43-533(5) does not limit a court's flexibility under an adoption petition to make an individualized determination of the child's best interests.

Thus, we agree with other jurisdictions that hold it is permissible for a court to consider, as part of its best interests analysis, the finality effect of adoption on other family attachments and decide to maintain the status quo of a joint

---

[37] See *Petition of D.I.S., supra* note 18. See, also, *In re M.F., supra* note 19.

[38] 2 Am. Jur. 2d *Adoption* § 129 (2014).

[39] *In re Adoption of Tachick, supra* note 30.

[40] See *Petition of D.I.S., supra* note 18. See, also, *In re M.F., supra* note 19.

custody arrangement.[41] For example, in *State in Interest of P.T.*,[42] the court affirmed the lower court's determination that it was not in the child's best interests to grant a petition by the maternal grandparents to adopt the child, reasoning that maintaining the status quo of a joint custody guardianship arrangement with the paternal grandmother was preferable. The lower court found it would be detrimental to the child's best interests to put one party in control of the relationship. Instead, it was essential to the child's well-being to maintain the close and loving relationships the child had with both the maternal and paternal grandparents. The lower court recognized the reality of adoption was that it would permanently terminate familial relationships with other relatives. In affirming, the appellate court rejected the maternal grandparents' argument that it was speculative that adoption would change the bonds the child had with the paternal grandmother. It held the lower court did not err in determining it was in the child's best interests to have a flexible custody arrangement with all grandparents rather than a permanent adoption that would legally terminate the child's familial relationship with her paternal grandmother.

Similarly, in *Matter of the Adoption of M.J.W.*,[43] the appellate court affirmed an order of the lower court denying the maternal grandparents' petition to adopt, because it would disrupt the child's relationship with the paternal grandparents. There was antipathy between the paternal and maternal grandparents, especially on the part of the maternal grandparents with whom the child resided. The child did not reside with the paternal grandparents, and the paternal grandparents

---

[41] See, *Matter of the Adoption of M.J.W.*, 8 Wash. App. 2d 906, 438 P.3d 1244 (2019); *State in Interest of P.T.*, 159 So. 3d 1184 (La. App. 2015); 2 Haralambie, *supra* note 22, §§ 14:1 and 14:25. See, also, *Petition of Schomer, supra* note 20.

[42] *State in Interest of P.T., supra* note 41.

[43] *Matter of the Adoption of M.J.W., supra* note 41.

did not petition to adopt. Nevertheless, the GAL testified that the paternal grandparents played a vital role in the orphaned child's emotional health and well-being and should not be excluded from the child's upbringing. The lower court found it would harm the well-being of the child, who struggled with anxiety, to lose the relationship with either set of grandparents. Based on the maternal grandparents' animosity toward the paternal grandparents, the court reasoned it was likely adoption by the maternal grandparents would result in the diminishment or cessation of visitation with the paternal grandparents. The lower court concluded that the child had continuity, consistency, and stability under the visitation arrangement. In affirming, the appellate court held that the lower court did not abuse its discretion in finding it was not in the child's best interests to "upset the status quo that had been so critical" to the child's development.[44]

[16-18] Reducing best interests to whether the first person to the courthouse with an adoption petition is good enough to carry out parental responsibilities for a child is inconsistent with the comprehensive and individualized consideration traditionally expected of trial courts in determining a child's best interests. Adoption creates a new family and confers upon the adoptive parents the full panoply of parental rights and responsibilities. The best interests of the child who is the subject of an adoption petition must remain a flexible and unique determination based on specific evidence relating to that child. We hold that in determining whether adoption is in a child's best interests, a court may consider the effect of adoption on preexisting family attachments and weigh the alternative of continuing the status quo of a guardianship.

The county court stated Faith had firmly established relationships with both grandparents and that she "clearly needs" both relationships. The court also found Faith was bonded with Grace. The court found "Faith needs the security which

---

[44] *Id.* at 914, 438 P.3d at 1249.

comes from these attachments." These findings are supported by the evidence.

Ultimately, the court determined that Faith's need for the continuation of the strong attachments with the family members of both households weighed more heavily than the benefits of the permanency of adoption. It determined that Faith's needs for "certainty and structure of her surroundings and those to whom she relies for decision making authority" could be adequately met through a guardianship. Jerry and Stacey argue that if Faith were adopted, Kelly would still legally be a "grandparent" for the purposes of Nebraska's grandparent visitation statutes[45] and could adequately continue her relationship with Faith by seeking some unknown amount of court-ordered grandparent visitation under that scheme. We need not decide that legal question in this appeal. For a child who currently needs certainty and consistency in her familial attachments in both grandparents' households, the court's order denying the petition to adopt ensured maintenance of the status quo.

We recognize here the superior position, ability, and opportunity of the trial court to observe the witnesses.[46] Under the record presented, we cannot say that the county court's order denying the petition to adopt was contrary to law, unsupported by competent evidence, or arbitrary, capricious, or unreasonable.

## VI. CONCLUSION

For the foregoing reasons, we affirm the judgment of the county court.

Affirmed.

---

[45] See Neb. Rev. Stat. §§ 43-1801 to 43-1803 (Reissue 2016).

[46] See *Luebker v. Arkansas Dep't of Human Servs.*, 93 Ark. App. 173, 217 S.W.3d 172 (2005).