Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
01/26/2024 09:06 AM CST

In re Adoption of Kate S., a minor child.
Kelley L. and Richard L., appellants,
v. Dustin S., appellee.
___ N.W.2d ___

Filed January 26, 2024.    No. S-22-919.

1. **Adoption: Appeal and Error.** The standard of review in an appeal from a court's ruling on an adoption petition is error on the record.
2. **Judgments: Appeal and Error.** When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.
3. ____: ____. In instances when an appellate court is required to review cases for error appearing on the record, questions of law are nonetheless reviewed de novo on the record.
4. **Evidence: Appeal and Error.** Where credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give great weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another.
5. **Abandonment: Evidence: Proof.** In order for a court to find that abandonment has occurred, the petitioning party bears the burden of proving by clear and convincing evidence that the parent abandoned the child.
6. **Abandonment: Proof.** To constitute abandonment, it must appear that there has been, by the parents, a giving up or total desertion of the minor child. There must be shown an absolute relinquishment of the custody and control of the minor and thus the laying aside by the parents of all care for the minor.
7. **Abandonment: Words and Phrases.** Abandonment may be found where there is willful or intentional conduct on the part of the parent which evinces a settled purpose to forgo all parental duties and relinquish all parental claims to the child, or a willful neglect and refusal to perform the natural and legal obligations of parental care and support.

8. **Abandonment: Evidence.** The conduct constituting abandonment must appear by clear and convincing evidence to be willful, intentional, or voluntary, without just cause or excuse.

Appeal from the County Court for Douglas County: Derek R. Vaughn, Judge. Affirmed.

Lindsay R. Belmont, of Koenig | Dunne, P.C., L.L.O., for appellants.

Lisa M. Gonzalez, of Johnson & Pekny, L.L.C., for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Papik, J.

Kelley L. and Richard L., a married couple, filed a petition for stepparent adoption in county court. They sought to have Richard adopt Kelley's daughter, Kate S. They alleged that the consent of Kate's father, Dustin S., was not required because Dustin had abandoned Kate. Following a hearing at which abandonment was the sole issue, the county court denied the petition for adoption, and Kelley and Richard appeal. We find no error on the record, and we affirm.

## I. BACKGROUND

### 1. Events Preceding Petition
### for Adoption

The following evidence was presented to the county court at the hearing on Kelley and Richard's petition for adoption.

### (a) District Court Dissolution Decree

Kelley and Dustin were married in 2014. They had one child, Kate, born in 2016. According to Kelley, Dustin was violent toward her during the marriage. In 2017, Kelley and Dustin divorced by consent decree in district court.

The dissolution decree gave Kelley sole physical custody of Kate and both parties joint legal custody of Kate. It

ordered Dustin to pay $600 monthly child support. It also ordered Dustin to pay a specified portion of childcare and medical expenses.

The decree awarded Dustin parenting time with graduated phases. At all times relevant here, the first phase applied. That phase provided for supervised visits at designated times, 8 to 15 hours per week. To attain increased visitation, Dustin agreed to abide by the parenting plan and to cooperate with biweekly therapy for at least 4 months. The decree ordered firearms to be secured during visits. The decree also allowed Dustin daily telephone contact with Kate.

Under the decree, Dustin and Kelley were to communicate primarily by email or telephone and secondarily by text message. The decree required each party to keep the other informed of current addresses, telephone numbers, and places of employment. It also required them to allow grandparents and extended families reasonable access to Kate.

### (b) Protection Order; Dustin's Incarceration

In May 2017, Kelley obtained an ex parte protection order against Dustin for herself and Kate. Kelley explained that when she picked up Kate from a visit with Dustin, they were together, unsupervised, with "a gun out next to the bed with Kate." Kelley testified that Dustin was suicidal and alluded to "familicide." Kelley, however, agreed to have the protection order dismissed in June 2017.

In July 2017, Dustin was incarcerated after he was charged with second degree murder. For the first 3 to 4 months of Dustin's incarceration, Kelley took Kate to see him once a week. By December 2017, Kelley was no longer taking Kate to visit Dustin, though some telephone contact continued.

During Dustin's incarceration, he continued to pay monthly child support by automatic withdrawal and contributed to childcare and medical expenses, with assistance from his mother, Rhonda A., as his power of attorney.

(c) Dustin Transferred to Regional Center;
Communication Ceased;
Dustin Released

In September 2018, Dustin was transferred to a regional center. Kelley never took Kate to see Dustin there. Dustin testified that when Kelley cited the distance to the regional center as an impediment to visits, he offered to pay Kelley for fuel and for her time, but he said Kelley "wasn't interested in doing it." While Dustin was at the regional center, Kelley called him a few times, and he initiated telephone calls with Kate approximately twice a month. Dustin recalled that on one occasion he had identical children's books sent to him and to Kate, with the intention of reading them to her.

Dustin continued to meet his monthly child support obligation. But around December 2018, Dustin ceased contributing to childcare and medical expenses when Kelley stopped providing him with bills and receipts. Kelley admitted that she did not give Dustin the information he would need to pay the expenses directly.

In July 2019, Kelley terminated communication with Dustin and his family. At that time, Kelley stopped answering Dustin's calls to Kate. Kelley testified that around that time, she was "called to be a witness" in Dustin's criminal matter. For several years preceding July 2019, Kelley and Kate had frequent contact and visits with Dustin's mother, Rhonda. But in July 2019, Kelley blocked Rhonda and Dustin's other family members on social media, and Kelley changed her telephone number without giving her new number to Dustin or to anyone in his family. That same month, Kelley moved and did not update her address with Dustin, his family, or the district court. Rhonda testified that at that time, she tried to contact Kelley by telephone, email, and social media, but her calls would not go through, her emails "bounce[d] back," and she could not view Kelley's social media profile.

Dustin was released from the regional center in September 2019. The criminal charges against him were dismissed and were not refiled.

Without Kelley's contact information, Dustin tried to reach her on social media in October 2019, but Kelley blocked him and did not respond. Dustin testified that he had lost Kelley's email address during his incarceration. Rhonda testified that after Dustin's release, she assisted him in trying to contact Kelley through telephone, email, and social media, again without success.

Kelley testified that she did not have Dustin's contact information after his release but did try to locate him. Kelley testified that she believed the email address she had for Dustin was not working when he was copied on an email but did not answer.

### (d) Dustin Seeks Modification; Kelley
### Seeks Termination; District Court
### Orders Reunification Therapy

In November 2019, Dustin filed a complaint to modify the divorce decree in district court, seeking changes to parenting time and child support. Dustin's complaint provided the city and state where he resided, but not his street address. It was served on Kelley at her workplace.

Kelley filed an answer and counterclaim to terminate Dustin's parental rights. "Due to safety concerns," she requested that Kate's address not be disclosed. Kelley alleged that Dustin had had no contact with Kate since 2017 and had failed to exercise his parenting time. Kelley requested termination based on the assertion that Dustin could not discharge his parental responsibilities due to mental illness or mental deficiency pursuant to Neb. Rev. Stat. § 43-292(5) (Reissue 2016) and on Kate's best interests. In the alternative, Kelley requested appointment of a guardian ad litem (GAL).

Subsequently, Dustin filed a motion to enforce visitation, and Kelley filed a motion for a psychological evaluation of Dustin.

In April 2020, the district court granted Dustin's motion to enforce visitation, subject to limitations. It ordered Dustin

to first exercise parenting time in a therapeutic setting, facilitated by therapist Glenda Cottam, and ordered Dustin's routine parenting time under the original first graduated phase to resume upon Cottam's recommendation. The district court also ordered Dustin to submit to a full psychological evaluation. The district court held the GAL motion in abeyance.

Kelley testified that there had been no district court orders resolving Dustin's complaint to modify the decree or her counterclaim to terminate Dustin's parental rights, and the record contains no such orders.

(e) Reunification Therapy Incomplete;
No Current Psychological Evaluation

Both Dustin and Kelley spoke to Cottam on the telephone in May 2020, but therapeutic parenting time did not occur. Dustin testified that he never heard back from Cottam after his initial conversation with her, even though he called her office regarding a followup session. But Cottam testified that she was not aware that Dustin had tried to reach her through her office. Cottam testified that the "next step" would have been to observe Kate and Kelley in person, and Dustin testified that he paid for the session; however, the session did not occur. According to Cottam, Kelley told her that her doctor advised her not to have an in-person appointment for a while, due to concerns about COVID-19 exposure. Cottam reported she would have been able to move forward with Dustin had he reached out, regardless of what Kelley was doing. There was also testimony that Cottam emailed counsel for both parties seeking followup information regarding Dustin, but that Cottam did not receive any response.

Dustin did not obtain a psychological evaluation as ordered by the district court. Dustin testified that in response to the order, he told the Veterans' Administration (VA) he needed a psychological evaluation to see his daughter and his "doctor wrote [him] three sentences." The county court received documentation that Dustin obtained a copy of his VA

psychological evaluation completed in October 2019, prior to the order requiring an evaluation. Cottam testified that a psychological evaluation of Dustin would "[a]bsolutely" aid in the reunification therapy between Dustin and Kate because Cottam did not know either parent or Kate prior to her involvement in the matter but that the absence of the psychological evaluation did not prevent her from moving forward with reunification therapy.

### (f) Dustin Stops Paying Child Support

Dustin remained current on his $600-per-month child support obligation until May 2020 when he stopped his automatic payment. Dustin explained that he stopped paying child support when he learned that Kelley had received an apportionment of his VA benefits in the amount of $500 per month for 25 months, starting in September 2017. When asked whether there were conversations with child support enforcement personnel to obtain a credit for the apportionment payments Kelley received, Dustin testified, "That's what I want to have happen. I don't know that it ever—I mean, if I—if it shows me still behind, it, you know, probably didn't happen." Rhonda testified that Dustin indicated to her that once "the apportionment money was kind of r[u]n out," he would begin to pay child support again.

### 2. Kelley and Richard Petition for Adoption in County Court; Consent of District Court

On April 1, 2021, Kelley and Richard filed a petition for adoption in county court. They sought to have Richard, whom Kelley married in January 2020, adopt Kate, and they attached Kelley's consent to the adoption. The petition alleged that Dustin's consent to the adoption was not required under Neb. Rev. Stat. § 43-104(2)(c) (Reissue 2016) because Dustin had legally abandoned Kate for at least 6 months. The petition acknowledged that a modification proceeding was pending in the district court. On April 6, 2021, in the

district court, Kelley filed a motion seeking that court's consent to Richard's adoption of Kate pursuant to the version of § 43-104(1)(b) in effect at that time. The motion was served on Dustin's counsel.

On May 11, 2021, the district court granted the motion for consent to adoption following a hearing; Kelley appeared at the hearing with counsel, but Dustin did not appear. Dustin testified that he was not notified of the hearing by his counsel, who had withdrawn a few days before, or by Kelley's counsel.

On June 18, 2021, the county court appointed a GAL to investigate whether Dustin had abandoned Kate. The GAL later met with Kate, who identified Richard as "Daddy" and denied considering anyone else a "dad."

Represented by new counsel, Dustin filed an objection to the adoption in county court in October 2021. He alleged that he had not legally abandoned Kate and that adoption by Richard was not in Kate's best interests.

The GAL testified that in November or December 2021, Dustin talked to her about the case. Dustin expressed to the GAL that he wanted a relationship with Kate and wanted to be part of her life.

### 3. Hearing on Petition for Adoption

The county court conducted a hearing on the petition for adoption in June and August 2022, identifying abandonment as the sole issue. The preceding evidence was presented.

### 4. County Court Order

The county court determined that Dustin had not abandoned Kate, granted Dustin's objection to the adoption, and denied the petition for adoption.

The county court reasoned that although Dustin did not "take all the necessary steps he needed to be involved in [Kate's] life," did not take all the steps to complete reunification therapy, and had not paid the required child support, "the

evidence persuades the [county court] that [Kelley] hindered [Dustin] and [Rhonda] from having meaningful contact or for that matter, a relationship with Kate." The county court specifically noted that it found Rhonda's testimony "most credible." The county court stated that based on the record, it was unable to find that Dustin's actions demonstrated that he had completely deserted Kate. It continued, "Additionally, this Court concludes that the ongoing unsettled matters in the District Court need resolution. If [Dustin] fails to comply with the Orders of the District Court, the issue regarding terminating his parental rights could be litigated." The county court determined that Kelley and Richard had not established by clear and convincing evidence that Dustin had abandoned Kate.

## II. ASSIGNMENTS OF ERROR

Kelley and Richard assign that the county court erred (1) in finding that Dustin did not abandon Kate pursuant to § 43-104 and (2) "in finding that the district court matters needed resolution prior to litigating the issue of terminating Dustin's parental rights."

## III. STANDARD OF REVIEW

[1-3] The standard of review in an appeal from a court's ruling on an adoption petition is error on the record. *In re Adoption of Faith F.*, 313 Neb. 491, 984 N.W.2d 640 (2023). When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id.* In instances when an appellate court is required to review cases for error appearing on the record, questions of law are nonetheless reviewed de novo on the record. *Id.*

[4] Where credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give great weight to, the fact that the trial court heard and

observed the witnesses and accepted one version of the facts rather than another. *Jeremiah J. v. Dakota D.*, 287 Neb. 617, 843 N.W.2d 820 (2014).

## IV. ANALYSIS

### 1. Abandonment

In Nebraska, the matter of adoption is statutory. See *In re Adoption of Micah H.*, 301 Neb. 437, 918 N.W.2d 834 (2018). Amendments to the statute at issue here, § 43-104, took effect after Kelley and Richard filed their petition for adoption but before the county court issued its order. See 2022 Neb. Laws, L.B. 741, § 6. Because those amendments are not mentioned by the parties and did not substantively change the provisions relevant here, this opinion hereafter refers to the most recent version of the statute, § 43-104 (Cum. Supp. 2022).

[5] Under § 43-104, an adoption cannot be decreed unless a biological parent either consents to the adoption or comes clearly within a statutory exception to such consent. See *In re Adoption of Micah H., supra.* Kelley and Richard's petition sought to proceed without Dustin's consent using one such statutory exception: abandonment. Section 43-104(4)(b) provides that consent to adoption is not required of a parent who has "abandoned the child for at least six months next preceding the filing of the adoption petition." In order for a court to find that abandonment has occurred, the petitioning party bears the burden of proving by clear and convincing evidence that the parent abandoned the child. *In re Adoption of Micah H., supra.* See, also, *Malousek v. Meyer*, 309 Neb. 803, 962 N.W.2d 676 (2021) (clear and convincing evidence is evidence which produces in trier of fact firm belief or conviction about existence of fact to be proved). Kelley and Richard claim that the county court erred in finding that they had not satisfied this burden. They essentially contend that the county court's order was not supported by competent evidence. We disagree.

[6-8] The 6-month statutory period in § 43-104 is not viewed in a vacuum. See *In re Adoption of Micah H., supra.* A court may consider the evidence of a parent's conduct, either before or after the statutory period, because this evidence is relevant to a determination of whether the purpose and intent of that parent was to abandon his or her child or children. See *id.* See, also, *Jeremiah J. v. Dakota D., supra* (question of abandonment is largely one of intent, to be determined in each case from all facts and circumstances). To constitute abandonment, it must appear that there has been, by the parent, a giving up or total desertion of the minor child. *In re Adoption of Micah H., supra.* There must be shown an absolute relinquishment of the custody and control of the minor and thus the laying aside by the parent of all care for the minor. *Id.* We have also said that abandonment may be found where there is "willful or intentional conduct on the part of the parent which evinces a settled purpose to forgo all parental duties and relinquish all parental claims to the child, or a willful neglect and refusal to perform the natural and legal obligations of parental care and support." See *id.* at 453, 918 N.W.2d at 848. The conduct constituting abandonment must appear by clear and convincing evidence to be willful, intentional, or voluntary, without just cause or excuse. *Id.*

Guided by these principles, the county court acknowledged that Dustin could have done more to be involved in Kate's life, including paying child support and completing reunification therapy with Cottam. However, it found Rhonda's testimony to be most credible and determined that Kelley, for reasons of which the county court was aware, hindered Dustin from having meaningful contact with Kate. Based on this evidence, the county court was unable to find that Dustin demonstrated a complete desertion of Kate such that he had abandoned her. Upon our review for errors on the record, we conclude that the county court's decision was supported by competent evidence.

The county court heard evidence that during the years preceding the statutory 6-month period, Dustin's relationship with Kate was indeed hampered by his 2017 incarceration and his subsequent transfer to a regional center in 2018. However, the record shows that during those years, Dustin continued to pay child support. Dustin also continued to contribute toward childcare and medical expenses until Kelley stopped providing him with the necessary information to do so in December 2018. While he was detained, Dustin attempted to maintain a connection with Kate through visits and telephone calls, but eventually, Kelley stopped bringing Kate for visits.

It is undisputed that a few months before Dustin's September 2019 release from the regional center, Kelley ceased all contact with Dustin and his family. She changed her telephone number and address without notifying Dustin and his family and blocked them on social media. Rhonda, whom the county court found most credible, testified that after Dustin's release, she helped Dustin in efforts to reach Kelley by telephone, email, and social media, without success. At oral argument, Kelley and Richard acknowledged the county court's credibility determination, and they conceded that testimony by Rhonda supported the notion that Dustin did not pull away from Kate, but, rather, Kelley pulled Kate away from Dustin.

In May 2020, Dustin unilaterally stopped his child support payments, but his testimony showed that he did not view this as a complete withdrawal of financial support for Kate. His testimony, corroborated by Rhonda, was that he believed he was entitled to a substantial credit for the apportionment funds Kelley had withdrawn for 25 months without his knowledge. Although we do not suggest Kelley's actions automatically freed Dustin from his child support obligations, neither do we see Dustin's actions as conclusively demonstrating a settled purpose to cease supporting Kate altogether.

We view the evidence regarding Dustin's efforts to complete reunification therapy and a psychological evaluation in

much the same way. Perhaps Dustin could have done more, but there was nonetheless competent evidence that he did not intend to relinquish his relationship with Kate.

We also recognize that other than Dustin's perceived child support "credit," the record does not contain any evidence that he supported or contacted Kate during the 6 months preceding the petition for adoption, from October 2020 to April 2021. But this period was preceded by Kelley's efforts to exclude Dustin from Kate's life by depriving him of the information he needed to reach her, and we have previously reasoned that such actions can bear on the question of whether a parent intended to abandon a child. See *Jeremiah J. v. Dakota D.*, 287 Neb. 617, 843 N.W.2d 820 (2014). Whatever Kelley's reasons for her actions, under the circumstances in this case, we conclude there was competent evidence that Dustin had not demonstrated a "settled purpose to forgo all parental duties and relinquish all parental claims" to Kate or "a willful neglect and refusal to perform the natural and legal obligations of parental care and support." *In re Adoption of Micah H.*, 301 Neb. 437, 453, 918 N.W.2d 834, 848 (2018).

Kelley and Richard cite other evidence that tended to support a finding that Dustin abandoned Kate. But our standard of review does not allow us to weigh the facts anew. Our inquiry is whether there was competent evidence to support the county court's finding that Dustin did not abandon Kate. As we have explained, we conclude that there was.

## 2. Reference to District
## Court Proceedings

Kelley and Richard also take issue with the following statement in the county court's order: "Additionally, this Court concludes that the ongoing unsettled matters in the District Court need resolution. If [Dustin] fails to comply with the Orders of the District Court, the issue regarding terminating his parental rights could be litigated." Kelley and Richard assign that the county court erred "in finding that the district

court matters needed resolution prior to litigating the issue of terminating Dustin's parental rights." They argue that "[t]he interplay between the district court matters and the adoption matter should bear no weight on the issue of abandonment," brief for appellants at 28, because the district court had consented to the adoption proceedings and "[t]here was nothing legally requiring resolution of the modification matter in district court prior to an adoption being decreed," *id*. at 27. On this point at oral argument, Kelley and Richard further explained that the county court erred in considering the status of the district court proceedings in its ultimate finding regarding abandonment. We disagree and discern no error.

We read the county court's reference to unresolved proceedings in district court to acknowledge, as we mentioned above, that abandonment is not the only path to bypass parental consent to adoption under § 43-104. Section 43-104(4)(c) provides that parental consent to adoption is not required of a parent whose parental rights have been terminated. Given this framework, we understand the county court to have observed that if Dustin's parental rights to Kate were subsequently terminated in response to Kelley's earlier motion in the district court modification proceedings, adoption could be pursued without Dustin's consent. Indeed, at oral argument, Kelley and Richard agreed with this reading. Based on this understanding of the county court's statement, we are not persuaded that it was in error. Abandonment was the only exception to consent Kelley and Richard alleged in their petition for adoption, and we do not understand the county court to have considered the status of the district court proceedings in deciding that Kelley and Richard had failed to prove that Dustin abandoned Kate. Therefore, the county court did not err.

## V. CONCLUSION

Finding Kelley and Richard's assigned errors without merit, we affirm the county court's order.

Affirmed.